**UNITED STATES of America,**

v.

**Henry G. CISNEROS, et al., Defendants.**

**No. CRIM. A. 97–0485(SS).**

United States District Court, District of Columbia.

July 30, 1998.

Opinion Denying Reconsideration
Sept. 17, 1998.

Mathew S. Rosengart, Mark V. Jackowski, Office of Independent Counsel, Washington, DC, for the United States.

Brendan Vincent Sullivan, Jr., Williams & Connolly, Washington, DC, Marcie Robin Ziegler, Washington, DC, for Henry G. Cisneros, defendant.

Roger Mark Adelman, Washington, DC, for Linda D. Medlar, defendant.

Abbe David Lowell, Brand, Lowell & Ryan, Washington, DC, for Sylvia Arce–Garcia, defendant.

Jeffrey Gans, Steptoe & Johnson, L.L.P., Washington, DC, for John D. Rosales, defendant.

## MEMORANDUM OPINION

SPORKIN, District Judge.

This matter comes before the Court on the following motions:

(1) Defendant Henry G. Cisneros' motion to dismiss Counts 1–18 because of separation of powers and the political question doctrine;

(2) Cisneros' motion to dismiss Counts 2–17 and a portion of Count 1 for failure to state an offense because Cisneros' statements did not concern a matter within the jurisdiction of a federal department or agency;

(3) Cisneros' motion to dismiss Count 18 and a portion of Count 1 for failure to state an offense under 18 U.S.C. § 1505 because there was not a pending proceeding;

(4) Cisneros' motion to dismiss Count 18 and a portion of Count 1 on the grounds that the alleged proceeding and inquiry were allegedly not due and proper;

(5) Cisneros' motion to dismiss Counts 2–18 on the ground that the false statements and acts of concealment alleged in those counts are immaterial and Rosales' motion to dismiss Counts 19 and 20 because the false statements and acts of concealment alleged in those counts are immaterial;

(6) Cisneros' motion to dismiss Counts 2–5, 10–11, 15–16, and 18 because the alleged false statements at issue are vague;

(7) Cisneros' motion to dismiss Counts 6–9 and 17–18 for failing to state an offense under 18 U.S.C. § 1001 because Cisneros was not under a legal duty to disclose information concerning his relationship with Medlar;

(8) Cisneros' motion to dismiss Counts 3–5, 10–16, and 18 because there are no verbatim transcripts of the FBI interviews;

(9) Cisneros' motion to compel election among allegedly multiplicitous counts;

(10) Cisneros' motion to dismiss counts 2–5, 10–16, and 18 because they allegedly fail to satisfy the requirements of the Indictment Clause and Defendant John Rosales' motion to dismiss Counts 19 and 20 for failing to specify how Rosales' statements were false; and

(11) Cisneros' motion to dismiss Counts 2–18 and a portion of Count 1 because the Independent Counsel allegedly failed to comply with the prosecutorial policies of the Department of Justice;

(12) Cisneros' motion to dismiss Count 18 for failure to state an offense under 18 U.S.C. § 1505;

(13) Cisneros' motion to dismiss a portion of Count 1 for failure to allege essential elements of the currency structuring offense that forms the predicate to the conspiracy charged in Count 1;

(14) Cisneros' motion to dismiss Counts 8–9 and a portion of Count 1 for lack of prosecutorial jurisdiction;

(15) Cisneros' motion to dismiss Count 1 because it alleges multiple conspiracies and Defendant Sylvia Arce–Garcia's motion to dismiss Count 1 for multiplicity;

(16) Cisneros' motion to dismiss Count 10 and a portion of Count 1 because each count allegedly contains internally inconsistent allegations;

(17) Cisneros' motion to dismiss Count 1 for failure to state an offense;

(18) Cisneros' motion to dismiss a portion of Count 1 based on Wharton's rule;

(19) Cisneros' motion to strike prejudicial surplusage from the Indictment;

(20) Cisneros' motion to strike all allegations in the Indictment that post-date the termination of the alleged conspiracy;

(21) Cisneros' and Arce–Garcia's motion for a bill of particulars.

## I. FACTUAL BACKGROUND

On December 11, 1997, a grand jury returned a twenty-one count Indictment against Defendants Henry G. Cisneros, Linda D. Medlar, Sylvia Arce–Garcia, and John D. Rosales[1] alleging that the Defendants engaged in a conspiracy to withhold information from, and make false statements to, various governmental entities in an effort to ensure that Cisneros would be nominated and confirmed as the Secretary of Housing and Urban Development ("HUD"). Cisneros is the former Secretary of Housing and Urban Development ("HUD"), who served from January 1993 to January 1997. Medlar is a former campaign fundraiser for Cisneros who allegedly engaged in an extramarital affair with Cinseros and then allegedly blackmailed him. Cisneros allegedly made blackmail payments in order to keep the details of the affair secret. Arce–Garcia and Rosales are both former employees of Cisneros Communications in San Antonio, Texas, who later became personal assistants to Cisneros during his tenure at HUD. The alleged false statements and acts of concealment relate primarily to payments Cisneros allegedly made to Medlar between 1989 and January 1994.

To support the charges brought against the Defendants, the Indictment alleges the following facts:

From May 1981 to May 1989, Cisneros served as the Mayor of San Antonio. During that period, he met Linda Medlar, who began working for him as a fundraiser. In March 1987, Cisneros and Medlar, both of whom were married to others, became romantically involved. Beginning in 1989 and continuing through January 1994, Cisneros made numerous payments to Medlar, ranging from approximately $2,500 to $15,000. The total amount of the payments exceeded $250,000. The payments were made in cash, by wire transfer, and by direct deposits into Medlar's bank accounts.

On December 17, 1992, President-elect Clinton publicly announced his intention to nominate Cisneros as the Secretary of the United States Department of Housing and Urban Development ("HUD"). Because Cisneros was a potential nominee, the FBI began an investigation of Cisneros pursuant to the Memorandum of Understanding ("MOU") between the FBI and the Clinton–Gore Transition Team.[2] The Clinton-

---

1. Count 1 of the Indictment charges all four Defendants with conspiracy. Counts 2–18 of the Indictment relate only to Cisneros, charging him with committing various offenses. Counts 19 and 20 of the Indictment relate only to Rosales, charging him with violations of 18 U.S.C. § 1001. Finally, Count 21 of the Indictment relates only to Medlar, charging her with a violation of 18 U.S.C. § 1001.

2. The MOU is a document, signed by the Attorney General, giving the FBI the authority to conduct background investigations of the President-elect's potential nominees for office.

Gore Transition Team screened high-ranking potential nominees of the President-elect in order to ensure that they were suitable to serve in the Clinton Administration. Under the MOU, the FBI was to conduct background investigations of the Clinton Administration's potential nominees at the request of the President-elect.

Cisneros allegedly paid Medlar before, during, and after he was nominated and confirmed as Secretary of HUD (from late summer 1992 to early 1994) in order to ensure her public silence about the extramarital affair and his previous payments to her. Cisneros directed Arce–Garcia and Rosales to conceal information from the FBI, the DOJ Security Office, and the United States Senate about his relationship with, and payments to, Medlar. In return, Cisneros promised Arce–Garcia and Rosales jobs on his staff at HUD.

On December 7, 1992, Cisneros completed and executed a Questionnaire for Sensitive Positions for National Security, commonly referred to as a Standard Form 86 ("SF–86"). On December 14, 1992, Cisneros executed a supplement to the SF–86. On Question 10S of the supplement, which asked whether there was anything in his personal life that could be used by someone to coerce or blackmail him, Cisneros answered that there was no basis upon which he would be subject to coercion or blackmail.

On December 30, 1992, a special agent of the FBI interviewed Cisneros in Washington, D.C. as part of the FBI background investigation of him. Cisneros stated that the SF–86 and the supplement were accurate and correct. He declared to the agent that he was unaware of anything that could be used to coerce or compromise him if he were to be nominated and confirmed as Secretary of HUD. According to the Indictment, Cisneros concealed from the FBI the following facts: that Medlar had threatened to go public about their relationship and about his payments to her; that he was, in fact, making payments to Medlar; and that despite making payments to Medlar substantially in excess of $10,000 per year since 1990, he had not filed informational Gift Tax Returns with the IRS.

On January 7, 1993, special agents of the FBI again interviewed Cisneros in Washington, D.C. when it came to the FBI's attention that Cisneros may have made payments to Medlar. When confronted with this information, Cisneros denied that the payments made to Medlar were "hush money" and that he was no longer making any payments to Medlar. He stated that the highest single payment he made to Medlar was approximately $2,500; that the total payments he made to Medlar never exceeded $10,000 per year; that Medlar had never blackmailed him; and that he had not engaged in any substantial discussions with Medlar since early 1991. He failed to disclose that he had directed Arce–Garcia and Rosales to conceal information regarding his relationship with and payments to Medlar.

On January 13, 1993, Cisneros was formally appointed and confirmed as Secretary of HUD. As Secretary, Cisneros was the senior official in charge of the Department of Housing and Urban Development, a member of President Clinton's Cabinet, and twelfth in line to succeed the President of the United States, should it ever have become necessary.

On July 29, 1994, Medlar filed a lawsuit against Cisneros in Lubbock County, Texas, seeking damages for breach of contract and fraud, allegedly arising from his promise to support her financially. That same day, Cisneros issued a press release acknowledging that he had once been romantically involved with Medlar and that he had assisted her financially for several years. On September 12, 1994, Medlar appeared on a broadcast of the television program *Inside Edition*. During the program, Medlar asserted, among other things, that Cisneros had lied to the FBI during the course of its background investigation about the payments that he had made to her. On air, Medlar produced a deposit slip of a payment made by Cisneros to her in the amount of $4,500, an amount larger than the $2,500 figure that Cisneros had told the FBI was the largest single payment he had ever made to her.

*Inside Edition* also broadcasted excerpts from conversations between Cisneros and Medlar that she had secretly recorded.

In September, 1994, as a result of the allegations made by Medlar on *Inside Edition*, United States Attorney General Janet Reno, as authorized by the Independent Counsel Reauthorization Act of 1994, 28 U.S.C. § 592, *et seq.* (1998), began an inquiry into whether Cisneros had lied to the FBI. As directed by Reno, special agents of the FBI interviewed Medlar in Lubbock, Texas on September 28 and 29, 1994. The Indictment alleges that during these interviews, Medlar claimed to be turning over to the FBI the original cassette tapes of her conversations with Cisneros and others. The tapes she provided, however, were not the originals.

In September 1994, the Internal Revenue Service ("IRS") also initiated an investigation of Cisneros because of the size of the payments he made to Medlar. On October 14, 1994, the Department of Justice ("DOJ") began a preliminary investigation, which concluded on March 13, 1995. That day, Attorney General Reno filed an application under 28 U.S.C. § 592(c)(1) (1998) to a Special Division of the United States Court of Appeals for the District of Columbia Circuit for the appointment of an Independent Counsel to investigate, and, if appropriate, to prosecute allegations concerning, among other things, Cisneros' alleged false statements to the FBI regarding the payments he made to Medlar. On May 24, 1995, the Special Division appointed David M. Barrett as Independent Counsel.

On October 31, 1995, a federal grand jury began investigating whether Cisneros committed violations of federal criminal law by making, or conspiring with others to make, false statements to the FBI during the course of its background investigation of him.

On November 27 and 28, 1995, Medlar entered into an immunity agreement with the Office of the Independent Counsel. Under the terms of the agreement, Medlar agreed to waive her Fifth Amendment constitutional right against self-incrimination; to provide truthful, full, and complete information to the Independent Counsel and to law enforcement personnel, including the FBI; to answer truthfully and completely all questions concerning the subject matter of the Independent Counsel's investigation; and not to attempt to protect or implicate anyone through false information or omissions. During an interview in the District of Columbia, Medlar violated the terms of this agreement by falsely advising special agents of the FBI that she provided the original tapes of her conversations with Cisneros and others to the IRS on May 31, 1995.

\* \* \* \* \* \*

On December 11, 1997, the grand jury returned a twenty-one count Indictment against Defendants Cisneros, Medlar, Arce-Garcia, and Rosales. Count 1 of the Indictment charges all four Defendants with conspiracy to defraud the United States and conspiracy to commit offenses against the United States in violation of 18 U.S.C. § 371 (1998). From the summer of 1992 through on or about September 12, 1994, Count 1 alleges that all four Defendants conspired to defraud the United States by impeding the lawful government functions of: (a) the United States Senate in its confirmation process; (b) the FBI in conducting its background check; and (c) the Department of Justice ("DOJ") personnel security office in screening Cisneros for a national security clearance and in vetting him for a cabinet position in President Clinton's administration.

Count 1 of the Indictment further alleges that all four Defendants conspired to commit offenses against the United States by obstructing inquiries of the United States Congress in violation of 18 U.S.C. § 1505; obstructing the proceeding conducted by the DOJ in violation of 18 U.S.C. § 1505; making false statements and concealing material information from government agencies in violation of 18 U.S.C. § 1001; and structuring and assisting transactions with a financial institution to evade the financial reporting requirements of 31 U.S.C. § 5313(a) in violation of 31 U.S.C. § 5324.

Counts 2, 3, 4, 5, 10, 11, 12, 14, 15, and 16 allege that Defendant Cisneros made various

false, fictitious, and fraudulent statements and representations in violation of 18 U.S.C. § 1001. Counts 6, 7, 8, 9, 13, and 17 allege that Defendant Cisneros engaged in various attempts to conceal and cover up material facts relating to his payments to Defendant Medlar. Count 18 alleges that Defendant Cisneros engaged in obstruction of justice in violation of 18 U.S.C. § 1505. Counts 19 and 20 allege that Defendant Rosales made false, fictitious, and fraudulent statements and representations regarding his knowledge of Defendant Cisneros' payments to Defendant Medlar in violation of 18 U.S.C. § 1001. Finally, Count 21 alleges that Defendant Medlar made false, fictitious, and fraudulent statements and representations in violation of 18 U.S.C. § 1001 by stating in an FBI interview that she provided the IRS with original tapes of her recorded conversations with Cisneros when, in fact, the tapes were copies.

On June 8, 1998, the Court held a hearing on the Defendants' motions for severance and on Defendant Cisneros' motion to dismiss the Indictment for lack of prosecutorial authority. The Court granted Cisneros' motion to sever Medlar from the trial with the Government not objecting. The Court denied Rosales and Arce–Garcia's motions for severance. Although the Court declined to sever Counts 19 and 20 from the Indictment, the Court severed Count 21 since that Count related only to Medlar. Additionally, the Court denied Cisneros' motion to dismiss the Indictment for lack of prosecutorial authority. *See United States v. Cisneros*, 3en F.Supp.2d 4en, 1998 WL 341587 (D.D.C. Jun. 19, 1998).

Remaining in this case are Defendants Cisneros, Rosales, and Arce–Garcia. The Court will now consider the remainder of the motions filed in this case by these three Defendants. Because Medlar has been severed from the case, the Court will not consider Defendant Medlar's motions in this opinion.[3]

---

**3.** The Defendants also join in each other's motions. Although the Court will refer only to the Defendant who originally filed the motion, the

## II. ANALYSIS AND DECISION

### 1. Separation of Powers and Political Question

■ Defendant Cisneros moves the Court to dismiss Counts 1–18 because of separation of powers and the political question doctrine. Cisneros claims that Counts 1–18 raise nonjusticiable issues involving his eligibility for a security clearance and his suitability to serve as Secretary of HUD. As stated above, Count 1 of the Indictment charges all four Defendants with the alleged conspiracy; Counts 2–19 charge Cisneros with making false statements and concealing material information from the FBI during his background investigation; and Count 18 charges Cisneros with obstructing the DOJ Personnel Security Office's determination of his national security clearance. Cisneros contends that under the Constitution, these matters are expressly delegated to the executive and legislative branches. Accordingly, the Court and/or a jury cannot adjudicate the charges in Counts 1–18. He claims that to do so "would constitute an unconstitutional intrusion by the judiciary into the inner workings of coordinate branches, and would mire the Court in political questions which are not governed by judicially manageable standards." Cisneros' Motion to Dismiss Counts 1–18 of the Indictment on Grounds of Separation of Powers and Political Doctrine, at 5.

■ A fundamental tenet of American constitutional law is the separation of powers between the three branches. "Questions, in their nature political, or which are, by the constitution and laws, submitted to the executive" or legislative branch may not be adjudicated by the judicial branch. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170, 2 L.Ed. 60 (1803). Out of respect for the separation of powers, the Supreme Court derived the doctrine of "political question," which prevents courts from deciding cases which raise constitutional questions implicating the powers of the other "political" branches. First enunciated by the Court in *Luther v. Borden*, 48 U.S. (7 How.) 1, 12 L.Ed. 581 (1849), the

Court has considered the applicability of the motions to all of the Defendants, where relevant.

doctrine of political question has been refined to mean that a case is nonjusticiable if: (1) there is "a textually demonstrable constitutional commitment of the issue to a coordinate political department"; or (2) "a lack of judicially discoverable and manageable standards for resolving it"; or (3) it is impossible to decide "without an initial policy determination of a kind clearly for nonjudicial discretion"; or (4) it is impossible to undertake "independent resolution without expressing lack of respect due coordinate branches of government"; or (5) there is "an unusual need for unquestioning adherence to a policial decision already made"; or (6) there is the potential of "embarrassment from multifarious pronouncements by various departments on one question." *Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

Cisneros claims that Counts 1–18 are "inextricably intertwined" with sensitive political questions concerning the relevant criteria to be used by the executive and legislative branches in nominating, confirming, and appointing a Cabinet Secretary, as well as granting him a national security clearance. Since much of the Indictment is premised on the allegation that Cisneros made false statements and obstructed justice to ensure that he would be viewed by the President-elect and the Senate as a suitable candidate for HUD Secretary, Cisneros claims that Counts 1–18 necessarily require the judiciary to second-guess whether or not such alleged actions should have been material[4] to the President and Senate's determination. This, he claims, is an impermissible intrusion by the Court into the province of the executive branch to nominate Superior Officers of the United States and of the legislative branch to confirm. *See* U.S. Const., Art. II, Sec. 2. Similarly, Cisneros claims that since Counts 1–18 allege that he acted in an illegal manner to ensure that he would be granted a national security clearance, adjudicating these charges necessarily requires the judiciary to second-guess the criteria used by the executive branch in awarding the clearance. As

the President is the "Commander in Chief," U.S. Const., Art. II, Sec. 2, with sole discretion over security decisions made pursuant to that power, Cisneros contends that the doctrine of political question forbids the Court from reviewing the President's decision.

The Court is not persuaded by Cisneros' constitutional interpretation. The Court of Appeals for this Circuit spoke on the very issue raised by Cisneros in *United States v. Durenberger,* 48 F.3d 1239 (D.C.Cir.1995). David F. Durenberger, then a Senator from Minnesota, moved to dismiss the indictment against him alleging that he submitted false claims to the Senate in violation of the False Claims Act, 18 U.S.C. § 287. He asserted that to consider the case, which required the alleged false claims to be "material," would be in violation of separation of powers. Durenberger argued that the claims he submitted, in which he asked to be reimbursed for staying in an out-of-town house that he had an undisclosed financial stake in, could only be "material" if the Senate's rule for reimbursement barred such self-interested claims. Yet the 1987 and 1988 versions of the rule were ambiguous as to whether they barred such claims. To try the case, Durenberger argued that the court would necessarily have to interpret the rule in the first instance in order to reach materiality. In other words, Durenberger argued that a court could find his false statements material only if it determined that the 1987–88 Senate rules did not permit him to be reimbursed for such expenses. Since the rules were uncertain, he claimed that the court would have to make "an initial policy determination of a kind clearly for nonjudicial discretion," in an area lacking "judicially discoverable and manageable standards for resolving" the issue. *Id.* 48 F.3d at 1242 (quoting *Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)). As the *Durenberger* court found, it would transgress the "principles of separation of powers prohibiting the judiciary from intruding on the Senate's prerogative to 'determine the Rules of its Pro-

---

4. In particular, Cisneros focuses most of his motion on Counts 2–17, which allege that he made false statements in violation of 18 U.S.C. § 1001 (1994). Under 18 U.S.C. § 1001, the govern-

ment must prove not only that the statements were falsely made, but also that they were "material."

ceedings.'" *Id.* (quoting U.S. Const., Art. I, Sec. 5, Cl. 2). In essence, he raised the same constitutional claim as Cisneros raises today.

The Court of Appeals rejected the argument and held that the court's determination of the materiality of Durenberger's alleged false statements to the Senate in no way compromised the independence and authority of that body. To characterize it as a political question was to "miscast the issue." *Id.* 48 F.3d at 1244. Clearly, the Senate rules contemplated that individuals traveling on official business would support their claims for reimbursement "with truthful vouchers and accurate supporting receipts." *Id.* In order to serve their purposes, administrative disclosure rules necessarily depend upon the truthfulness of those submitting the requisite forms. The essence of § 1001 is to prevent deception on these forms. *See id.* The *Durenberger* court held that to determine whether or not Durenberger "lied," in violation of section 1001, required "no resolution of ambiguities in the Senate's internal rules." *Id.* In sum, the relevant question was "not whether Durenberger was entitled to reimbursement if he had submitted truthful vouchers, but whether the false statements in his vouchers were material because they were 'capable of influencing' the Senate's reimbursement decision." *Id.* (quoting *United States v. Diggs,* 613 F.2d 988, 999 (D.C.Cir. 1979), *cert. denied* 446 U.S. 982, 100 S.Ct. 2961, 64 L.Ed.2d 838 (1980)). Since the Senate rule required that reimbursement not exceed actual expenses, the fact that Durenberger had a financial interest in the out-of-town accommodations he sought reimbursement for was clearly material. The court reasoned that had the Senate known, it might well have sought additional information to verify that it had not reimbursed him for more than what it actually "cost" him to stay in his own house. Again, the relevant

issue was not whether, in fact, the Senate would have allowed the reimbursement, but whether the false statements in his voucher could have, if disclosed, influenced the Senate in its decision.

Applying *Durenberger* to the present case, it is clear that the relevant question is not what the criteria for Presidential nominees should be, but whether the false statements Cisneros made were "capable of influencing" a nomination. Regardless of whether or not the information he withheld actually affected the President-elect or the Senate's determinations, the facts that Cisneros allegedly lied about involved matters that were "capable of influencing" those determinations. According to the Indictment, the alleged false statements made by Cisneros concerned an adulterous affair, hush money, and a conspiracy to conceal the information from the President-elect and Senate. The alleged false statements were of the type that, in the least, could have influenced the President-elect or Senate to investigate further or seek an explanation from Cisneros before they conferred upon him any nomination, confirmation, or security clearance. In this case, the determination of materiality in no way would require second-guessing the actual criteria used by the coordinate branches in the exercise of their discretion. Accordingly, this Court denies Defendant Cisneros' motion to dismiss Counts 1–18 of the Indictment on the grounds of separation of powers and the doctrine of political question.[5]

## 2. Jurisdiction Under 18 U.S.C. § 1001

■ Cisneros moves the Court to dismiss Counts 2–17 and the relevant portion of Count 1 for failure to state an offense under 18 U.S.C. § 1001 (1994). Section 1001, as read at the time of Defendant's alleged acts in the Indictment,[6] provides:

---

5. Since the statements were made to FBI agents discharging their responsibilities, as will be discussed in Section 2, *infra,* they would clearly be actionable.

6. In 1996, Congress amended § 1001 to extend its coverage to "any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States." False Statements Accountability Act of 1996,

Pub.L. No. 104–292, § 2, 110 Stat. 3459 (1996). The amendment came in response to the Supreme Court's opinion in *Hubbard v. United States,* 514 U.S. 695, 115 S.Ct. 1754, 131 L.Ed.2d 779 (1995), in which the Court overturned *United States v. Bramblett,* 348 U.S. 503, 75 S.Ct. 504, 99 L.Ed. 594 (1955), and held that a federal court was neither a "department or agency" within the meaning of § 1001.

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up, by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined under this title or imprisoned not more than five years, or both.

To constitute an offense under § 1001, each of the following elements must be established: (1) the defendant must have made a statement; (2) which was false; (3) material;[7] (4) made knowingly and willfully; and (5) concerning a matter within the jurisdiction of a federal department or agency. *See, e.g., United States v. Ross*, 77 F.3d 1525, 1543–44 (7th Cir.1996). Cisneros claims that as a matter of law, the false statements alleged in Counts 2–17 and the relevant portion of Count 1 fail to state an offense because they did not concern a matter "within the jurisdiction of a federal department or agency." Cisneros contends (1) that in conducting his background investigation, the FBI and DOJ Personnel Office were acting under the exclusive authority of the President-elect, not their own department or agency; and (2) that even if the FBI acted in its capacity as an agency, it had no statutory authority to conduct such a background investigation of the President-elect's likely nominees—it was not a matter within the "jurisdiction" of the FBI.

The Court is not persuaded by Cisneros' argument. Despite Cisneros' contention, at no time were the FBI and the DOJ under the exclusive control of the President-elect. Although the MOU states that the FBI's investigation is to be conducted for the President-elect at his request and that the FBI is required to submit the results of the investigations to the President-elect, the MOU does not divest the FBI of its independent authority. The MOU states that the "investigations shall only be conducted pursuant to the

agreement between the Attorney General and the President-elect." MOU, at 1.

The information obtained by the FBI is not for the exclusive use of the President-elect. It can be disseminated outside the FBI "when necessary to fulfill obligations imposed by law, FBI regulation or Presidential directive or Executive order." MOU, at 3. Thus, a careful reading of the MOU indicates that the FBI is acting under the authority of the outgoing administration in order to help facilitate the transition to the next. Although the investigation is conducted for the benefit of the President-elect, it nevertheless is conducted by agents of the FBI and the DOJ, who do not shed their duties and responsibilities as officers of the Government. They do not act as volunteers, outside the authority of the outgoing President and the Attorney General.

■ Cisneros also argues that because there was no explicit statute authorizing the background investigation, it could not have been within the jurisdiction of a federal department or agency. However, 28 U.S.C. § 533(3) grants the Attorney General broad authority and discretion in appointing officials to conduct investigations: "The Attorney General may appoint officials to conduct such other investigations regarding official matters under the control of the Department of Justice and the Department of State as may be directed by the Attorney General." Under § 533(3), the Attorney General had the authority to sign off on the MOU. Although there is no independent statute that explicitly authorizes the process of vetting potential nominees, § 1001 does not require that such a statutory basis exist. "[T]he phrase 'within the jurisdiction' merely differentiates the official, authorized functions of an agency or department from matters peripheral to the business of that body." *United States v. Rodgers*, 466 U.S. 475, 479, 104 S.Ct. 1942, 80 L.Ed.2d 492 (1984). " '[T]he term "jurisdiction" should not be given a narrow or technical meaning for purposes of § 1001.' " *Id.* 466 U.S. at 480, 104 S.Ct. 1942

---

**7.** As noted by then Judge Scalia in *United States v. Hansen*, 772 F.2d 940, 949 (D.C.Cir.1985), "[t]he portion of § 1001 [which applies here] does not explicitly require a showing of material-

ity, but we have held that requirement to be implicit." *Id.* (citing *Freidus v. United States*, 223 F.2d 598, 601 (D.C.Cir.1955)).

(quoting *Bryson v. United States*, 396 U.S. 64, 70, 90 S.Ct. 355, 24 L.Ed.2d 264 (1969).

The Defendants' argument would effectively undermine the very important transition process, which has ensured the effective and smooth changeover from one administration to another. The ability of this nation to have peaceful changes in administrations is the envy of the nations of the world. The procedures used by the Clinton/Gore Transition Team are those that have been used for many years, and have proven to be extremely effective. The FBI must have honest responses to its questions, and if they are not forthcoming, the Government must be able to take appropriate action. Accordingly, Cisneros' motion will be denied.

### 3. Pending Proceedings Under 18 U.S.C. § 1505

■ Cisneros moves the Court to dismiss Count 18 and a portion of Count 1 for failure to state an offense under 18 U.S.C. § 1505. Count 18 charges Cisneros with violating § 1505 for obstructing a DOJ Personnel Security Office investigation into whether he should have received a national security clearance. The relevant portion of Count 1 charges Cisneros with conspiring to obstruct a Senate confirmation hearing as well as the Personnel Security Office proceeding. To constitute an offense under § 1505 for obstruction of justice, an indictment must charge there was a proceeding pending before a department or agency of the United States. *See United States v. North*, 910 F.2d 843, 892 (D.C.Cir.1990). Cisneros claims that because the acts of obstruction alleged in Counts 1 and 18 occurred before the Senate inquiry and the Personnel Security Office proceeding were formally pending, these counts must be dismissed for failure to state an offense.

This Court is not persuaded by Cisneros' argument. "Under Fed.R.Crim.P. 12(b) an indictment may be dismissed where there is an infirmity of law in the prosecution; a court may not dismiss an indictment, however, on a determination of facts that should have been developed at trial." *United States v. Torkington*, 812 F.2d 1347, 1354 (11th Cir.1987) (citations omitted). In this instance, the determination of whether the proceedings were "pending" at the time of the alleged acts depends in large part upon the timing of events—specifically, when the proceedings began. The determination of the date at which the proceedings actually began clearly requires an analysis of facts, not law. This Circuit addressed this issue in *North*, holding the question of whether a proceeding was pending has to be submitted to the jury "in order to convict." *North*, 910 F.2d at 852. Accordingly, at this stage of the proceedings, the Court will deny Cisneros' motion.

### 4. Due and Proper Proceedings Under 18 U.S.C. § 1505

Cisneros also moves this Court to dismiss Count 18 and the relevant portion of Count 1 for failure to state an offense. As stated, *supra*, Count 18 charges Cisneros with violating 18 U.S.C. § 1505 for obstructing a DOJ Personnel Security Office investigation into whether he should have received a national security clearance. The relevant portion of Count 1 charges Cisneros with conspiring to violate § 1505 and obstruct a Senate confirmation hearing as well as the Personnel Security Office proceeding. To charge an offense under § 1505 for obstruction of justice, an indictment must allege the defendant obstructed a congressional inquiry or government proceeding that was a "due and proper" administration of the law. *See United States v. Poindexter*, 725 F.Supp. 13, 21 (D.D.C.1989); Leonard B. Sand, et al., 1 *Modern Federal Jury Instructions: Criminal* ¶ 46.02 (Instruction 46–9) (1996). Cisneros claims that because neither the Senate inquiry nor the Personnel Security Office proceeding were "due and proper," these counts must be dismissed for failure to state an offense.

In an effort to uphold the intent of Congress, courts have interpreted broadly the "due and proper" requirement included within 18 U.S.C. § 1505. *See e.g., Poindexter; United States v. Mitchell*, 877 F.2d 294 (4th Cir.1989); *Rice v. United States*, 356 F.2d 709 (8th Cir.1966). The statutory purpose of § 1505 is to "prevent any endeavor, whether successful or not, which is made for the purpose of corruptly influencing, obstructing or impeding an agency proceeding" or con-

gressional inquiry. Sand, ¶ 46.02 (Instruction 46–8). As stated in *Rice*, 356 F.2d at 714–15, this statute "should not be interpreted so narrowly as to defeat the purpose and intent of the legislative body that enacted it." *See also United States v. Mitchell*, 877 F.2d at 300 ("[S]everal courts have addressed the issue of what is [a] . . . proceeding under the statute. These decisions have uniformly held that this term should be construed broadly to effectuate the statute's purposes.") (citation omitted).

■ As a result, courts have been unwilling to pardon defendants based on technicalities or formalities. *See Poindexter*, 725 F.Supp. at 22, quoting *Shimon v. United States*, 352 F.2d 449, 450 (D.C.Cir.1965) ("Congress' concern with the obstruction of justice may not be avoided by such empty technicalities."). In fact, "it is established . . . that the statute protects preliminary and informal inquiries against obstruction as well as formal proceedings." *Id.* (citations omitted). Because Congress had no intention to permit witnesses to obstruct proceedings prior to its receiving formal authorization, it has not been the tendency of the courts to limit the term "proceeding" so narrowly. *See Rice*, 356 F.2d at 712 ("Congress clearly intended to punish any obstruction of the administrative process by impeding a witness in any proceeding before a governmental agency—at any stage of the proceedings. . . ."); *Poindexter*, 725 F.Supp. at 22. The question of whether a congressional investigation is due and proper "cannot be answered by a myopic focus on formality. Rather, it is properly answered by a careful examination of all the surrounding circumstances." *Mitchell*, 877 F.2d at 300. The *Mitchell* court further established that: "If it is apparent that the investigation is a legitimate exercise of investigative authority by a congressional committee in an area within the committee's purview, it should be protected by § 1505." *Id.* This Court will follow the standard set forth in *Mitchell*.

A. *The Senate Inquiry*

■ Cisneros claims that the Senate inquiry into his designation as nominee to be Secretary of HUD was not "due and proper" because the Senate committee initiated its inquiry prior to President Clinton officially sending the nomination to the Senate. Although Cisneros attempts to distinguish this argument from the losing argument proffered in *Poindexter*, the thrusts of each argument and the facts in each instance are very similar. Like the decision in *Poindexter*, this Court dismisses Cisneros' argument as too expansive an attempt to restrict the application of § 1505.

As in *Poindexter*, the facts in this case involve the chair of a congressional committee initiating a meeting with the defendant as part of an informal, preliminary inquiry. Similar to Poindexter, who argued the congressional committee did not have formal authorization, Cisneros asserts that the congressional committee lacks any authority. However, Cisneros' argument centers around a mere formality consistently ignored in practice. *See Senate Confirmation Process: Overview* (GD002002) ("Hearings are expected to be held in all committees between January 6th and 18th, and the committees will make every effort to complete all the rest of their work prior to Inauguration Day. . . . This was the practice during the two most recent transitions involving a shift in White House control: in 1977 . . . [and] in 1981. . . .") Cisneros claims Rule XXXI of the Standing Rules of the Senate, 103rd Congress, 1st Session (entitled "Executive Session—Proceedings on Nominations") only allows the Senate Committee on Banking, Housing, and Urban Affairs to investigate matters relating to *actual* nominees, not *potential* nominees. However, this argument focuses on similar technicalities and formalities which *Poindexter* court readily dismissed. Given the Banking Committee's established jurisdiction to consider nominees for HUD Secretary, and the acts taken by the committee in coordination with the transition from one administration to another, this inquiry clearly "is a legitimate exercise of investigative authority by a congressional committee in an area within the committee's purview" and, for this reason, "should be protected by § 1505." *Mitchell*, 877 F.2d at 300. Accepting Cisneros' argument would directly conflict with the intent Congress had

in enacting § 1505 and the manner in which courts have enforced it.

### B. *The Personnel Security Office Investigation*

█ Cisneros also argues that the DOJ Personnel Security Office was not due and proper because it had no authority to adjudicate whether Cisneros was entitled to a national security clearance. Cisneros claims only the President-elect had authority to make this decision. Because this argument is largely the same as that posed under Section 1, *supra*, the Court will deny Cisneros' motion.

### 5. Materiality Under 18 U.S.C. § 1001

█ Cisneros moves the Court to dismiss Counts 2–18 on the ground that the false statements and acts of concealment alleged in violation of 18 U.S.C. § 1001 are immaterial as a matter of law. As stated above, materiality is one of the elements that must be met to constitute an offense under § 1001. An alleged false statement or act of concealment is material if it "has a natural tendency to influence, or [is] capable of influencing, the decision of the tribunal" charged with making the decision. *United States v. Diggs*, 613 F.2d 988, 999 (D.C.Cir.1979) (quoting *Weinstock v. United States*, 231 F.2d 699, 701–02 (D.C.Cir.1956)); *see also United States v. Gaudin*, 515 U.S. 506, 509, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995) (quoting *Kungys v. United States*, 485 U.S. 759, 770, 108 S.Ct. 1537, 99 L.Ed.2d 839 (1988)). Cisneros claims that President-elect Clinton and his Transition Team were fully aware, from sources other than the FBI, of his alleged affair and subsequent payments to Medlar. Thus, Cisneros reasons that since this information did not affect the President-elect's decision to nominate him, the false statements charged against him must not be material as a matter of law.

In addition, Rosales moves the Court to dismiss Counts 19–20 on similar grounds. Counts 19 and 20 allege that Rosales made false statements to the IRS and FBI regarding his knowledge of Cisneros' alleged payments to Medlar. Rosales claims that these alleged false statements must be dismissed

as a matter of law because they were not material to the pending investigation because Cisneros and Medlar had already disclosed the relevant information about the alleged payments.

This Court rejects both Cisneros' and Rosales' position. As discussed above with regard to Cisneros' motion to dismiss the same counts on separation of powers and political question grounds, the Defendants misconstrue the test of materiality. For the purposes of § 1001, the relevant question is not whether, in fact, the relevant body relied upon the false information in making its determination. The test is merely whether that information had the capacity to influence the relevant decisionmaker. Courts have repeatedly held that proof of "actual reliance" is not necessary. "The Government need only make a reasonable showing of its potential effects." *United States v. Diggs*, 613 F.2d 988, 999 (D.C.Cir.1979) (quoting *Weinstock v. United States*, 231 F.2d 699, 701–02 (D.C.Cir.1956)) (footnote omitted); *see also United States v. Hansen*, 772 F.2d 940 (D.C.Cir.1985); *United States v. Dale*, 782 F.Supp. 615 (D.D.C.1991); *United States v. Poindexter*, 725 F.Supp. 13 (D.D.C.1989); *United States v. Puente*, 982 F.2d 156 (5th Cir.1993); *United States v. Whitaker*, 848 F.2d 914 (8th Cir.1988); *United States v. Corsino*, 812 F.2d 26 (1st Cir.1987).

In any event, the Supreme Court has held that materiality is an element of § 1001 that must be determined by the jury. *See United States v. Gaudin*, 515 U.S. 506, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995). Deciding whether or not a statement is material "requires the determination of at least two subsidiary questions of purely historical fact: (a) 'what statement was made?'; and (b) 'what decision was the agency trying to make?'. The ultimate question: (c) 'whether the statement was material to the decision,' requires applying the legal standard of materiality ... to these historical facts." *Id.* 515 U.S. at 512, 115 S.Ct. 2310. Cisneros asserts that while the jury is entitled to determine (a) and (b), (c) should be decided by the judge as a matter of law. However, the *Gaudin* Court explicitly rejected this argument by holding that (c) is a "mixed question

of law and fact" that must be given to the jury to decide.

Despite *Gaudin,* Cisneros insists that the Court should resolve the element of materiality as a matter of law "if no reasonable juror could find an alleged falsehood material in light of undisputed evidence of its immateriality." Cisneros Motion to Dismiss Counts 2–18 as Immaterial at 9. At this stage of the proceedings, before the Government has had the opportunity to present its evidence at trial, the Court cannot determine whether or not the Government's case is sufficient to go to a jury. The proper time for Cisneros to raise this claim is at trial.

### 6. Vagueness

■ Cisneros moves the Court to dismiss counts 2–5, 10–11, and 15–16 of the Indictment because he claims that these Counts fail to state an offense under 18 U.S.C. § 1001. Cisneros claims that Counts 2 and 3 must be dismissed because the question in SF–86 asking whether there was "anything" in Defendant's "personal life that could be used by someone to coerce or blackmail" him and whether there was anything in Defendant's life "that could cause an embarrassment to [him] or to the President if publicly known" is vague because it does not define the terms "coerce," "blackmail," or "embarrassment." Additionally, Cisneros asserts that the form does not offer any guidance on how to answer the question. Thus, one filling out the form must determine what he believes those definitions to be in order to complete the form. Further, Cisneros asserts that such qualitative terms do not give sufficient notice of what disclosure is required for Due Process purposes.

Cisneros claims that the allegedly false statements are imprecise, indefinite, and contain "loose" language. Because of the varying interpretations, they are not provably false. Thus, he argues that his alleged false statements have many potential interpretations, rendering it impossible for the Government to prove them false. Specifically, Cisneros claims that Count 15, alleging that Cisneros falsely stated to the FBI that "he had not had substantial at length discussions" with Medlar after 1991, is vague because "at length" is a subjective determination of time and "substantial" could refer to subject matter or time. Cisneros also argues that Count 11, alleging that Cisneros falsely represented that he was not "currently" making payments to Medlar is similarly imprecise because "currently" could mean that day, that week, or that month. Further, Cisneros challenges Count 5, alleging that he falsely stated that he had only "been with" one other woman other than Medlar during his marriage, because "been with" could mean anything from "a serious romantic relationship to a one-night stand." Cisneros also claims that Count 10, alleging that Cisneros falsely stated that "the payments made to Medlar did not constitute 'hush money' payments," is similarly vague because the statement does not indicate which of the payments are the subject of the statement. Finally, Cisneros argues for the dismissal of Counts 2, 3, and 4, which allege that Cisneros falsely responded to questions by stating that there was nothing in his personal life that could subject him to coercion or blackmail. Cisneros claims that the questions called for his subjective opinion, not for an objective fact.

This Circuit addressed false statements under § 1001 in *United States v. Milton,* 8 F.3d 39 (D.C.Cir.1993). In *Milton,* defendants were convicted of stealing money from the United States and making materially false statements by recruiting people to make false claims of discrimination to the Equal Employment Opportunity Commission, then keeping part of the money for themselves. Under § 1001, the government charged the defendants with falsely denying that they were responsible for the filing of discrimination claims. The defendants asserted they used the word "claim" in a literal sense; thus, the § 1001 charge should be dismissed. The court noted that while the Defendants' definition of "claim" was literally true, there are many other interpretations of the word. The court held that when a word has several meanings, its definition must be determined by "considering the term in context, taking into account the setting in which it appeared and the purpose for which it was used." *Id.* 8 F.3d at 45. The court held

that, like perjury, this is a question for the jury. *Id.* at 46.

Cisneros bases his argument on the holding in *United States v. Crop Growers,* 954 F.Supp. 335 (D.D.C.1997) where the court stated that "qualitative" language in regulations "do not provide sufficient notice that a particular disclosure is required to allow criminal liability to attach for alleged nondisclosure" because they are "too vague and amorphous to give fair notice, required by the Due Process clause, of what disclosure is required." However, Cisneros' reliance on *Crop Growers* is misplaced. *Crop Growers* involved the issue of what disclosures were required in mandatory SEC filings. The court held that the defendants do not have a duty to disclose uncharged concealment to the SEC as part of its regular required disclosures to the SEC. In contrast, this case involves specific questions asked to Cisneros regarding his past.

The meaning of Cisneros' statements is a matter that is within the province of a jury to determine. This Court cannot conclude, that as a matter of law, Cisneros' statements are so vague that a competent jury could not adequately determine their meaning. Because the meaning of Cisneros' statements presents issues of fact that should be determined by the jury, the Court will deny Cisneros' motion.

### 7. Legal Duty to Disclose

■ Cisneros moves to dismiss Counts 6 through 9, and 17 on the grounds that: (1) they fail to state an offense under 18 U.S.C. § 1001 because Cisneros did not have a legal duty to disclose the information he allegedly concealed. Cisneros also moves to dismiss Count 18 of the Indictment, which is largely predicated on the allegations in Counts 6 through 9 and 17. Specifically, Counts 6 through 9 allege that during an FBI interview on December 30, 1992, Cisneros concealed material facts about payments made to Medlar, Medlar's threat to go public, Cisneros' structuring of the payments in an effort to avoid triggering a Currency Transaction Report, and Cisneros' failure to file a Gift Tax Return. Count 17 charges Cisneros with the failure to disclose that he allegedly directed Garcia and Rosales to withhold information about payments to Medlar from the FBI during the January 7, 1993 interview.

Cisneros asserts that he had no legal duty to disclose the information during the December 30, 1992 interview. Cisneros relies on *United States v. Crop Growers Corp.,* 954 F.Supp. 335, 344 (D.D.C.1997) which held that "a violation of Section 1001 predicated on concealment requires that the defendant must have a legal duty to disclose the facts at the time of the alleged concealment." Cisneros claims that he did not have a legal duty under a regulation or statute to voluntarily disclose information about his relationship with and payments to Medlar. However, Executive Order 10450 requires that individuals seeking government employment possess such traits as reliability, trustworthiness, and loyalty. In *United States v. Calhoon,* 97 F.3d 518, 526 (11th Cir.1996), the court held that while there is an option of silence, once a defendant volunteers information, he has an obligation to refrain from telling half-truths or from excluding information necessary to make the statements accurate. Since Cisneros responded to the questions, he had a duty to include all information necessary to make his statements truthful. The FBI allegedly informed him of his right to remain silent. When Cisneros chose to respond to the questions, he had an obligation to tell the truth.

In addition, Cisneros makes a related argument by asserting that the Indictment fails to properly allege that he was under a legal obligation to disclose the details of his relationship with and payments to Medlar. However, in paragraphs 3, 4, and 5 of Counts 3–5, the Indictment alleges that the FBI told Cisneros that the purpose of the interview "was to ensure that complete, current, and accurate information would be available and obtained concerning CISNEROS's background" and that Cisneros had "to be completely truthful and forthcoming during the background investigation." Indictment, at 51–52.

Cisneros also asserts that the Government's § 1001 charges are based on passive nondisclosure, rather than an active

"scheme." However, in *United States v. Dale*, 991 F.2d 819 (D.C.Cir.1993), this Circuit held that a deliberate failure to disclose information can constitute an affirmative act. Accordingly, it is possible to violate § 1001 by concealing information where there is a duty to disclose.

Finally, Cisneros argues that he did not have adequate notice of the potential criminal implications of not responding truthfully to the FBI's questions, thus violating his Fifth Amendment Due Process Rights. The Indictment alleges that the FBI repeatedly informed Cisneros of his right not to speak and of the implications of making false statements if he did choose to speak. At this stage of the proceedings, the Court does not find that Cisneros lacked awareness that making false statements to the FBI could have criminal repercussions. Accordingly, the Court will deny Cisneros' motion.

### 8. Lack of Transcripts for FBI Interviews

Cisneros moves the Court to dismiss Counts 3–5, 10–16, and 18 because there are no verbatim transcripts of the FBI interviews. Cisneros claims that without the verbatim transcripts from Cisneros' December 30, 1992 and January 7, 1993 FBI interviews, the government cannot establish a false statement offense under 18 U.S.C. § 1001 because it cannot prove the actual questions it asked or Cisneros' actual statements during the interviews. Counts 3–5 charge Cisneros with false statements he allegedly made during a December 30, 1992 FBI interview. Counts 10–16 charge Cisneros with false statements he allegedly made during a January 7, 1993 FBI interview. Count 18 charges Cisneros with obstruction of justice.

This Circuit addressed this issue in *United States v. Poindexter*, 951 F.2d 369 (D.C.Cir. 1991). In *Poindexter*, the defendant argued that the government cannot charge him under § 1001 where "no oath is administered and no verbatim transcript is maintained." *Id.* 951 F.2d at 407. The Court held that "[t]he absence of such formal trappings is relevant, of course to the difficulty of proving beyond a reasonable doubt exactly what the defendant said and whether he intended to deceive his audience as to a material question of fact; but these are issues of the sufficiency of the evidence in a particular case, not reasons for carving a categorical exception from the statute." *Id.* 951 F.2d at 408.

As in *Poindexter*, Cisneros asserts that the government cannot charge him under § 1001 because the government did not produce a verbatim transcript. According to *Poindexter*, the lack of a verbatim transcript alone is not a valid ground for excluding the statements. The fact that there were no verbatim transcripts of Cisneros' statements is an issue of the sufficiency and weight of the evidence, which are questions for the jury. Accordingly, the Court will deny Cisneros' motion.

### 9. Multiplicity

Cisneros moves the Court to compel election among several counts in the Indictment because several of the alleged violations of 18 U.S.C. § 1001 are based on the same alleged false statements made by Cisneros during the course of the FBI background investigation. First, Cisneros claims that Counts 5 and 16 involve the same false statement. Count 5 alleges that on December 30, 1992, Cisneros lied to an FBI agent that he "he had only 'been with' one woman, other than MEDLAR, during his marriage to his wife." FBI special agent Thomas A. Bloch conducted the interview. Count 16 alleges that on January 7, 1993, Cisneros made the same statement to FBI special agents Bloch and Robert B. Cronin.

Second, Cisneros claims that Counts 6 and 11 involve the same false statement. Count 6 alleges that on December 30, 1992, Cisneros "[c]oncealed and covered up the fact that he was making payments to MEDLAR." Count 11 alleges that on January 7, 1993, Cisneros "stated that he was not 'currently' making payments to MEDLAR."

Cisneros also moves the Court to require the Government to elect between Counts 2, 3, 4, 7, 10, and 14 because all of these counts are based on the same alleged lie: that Cisneros was not subject to coercion or blackmail by Medlar. Count 2 alleges that Cisneros lied on the SF–86 form that there was no basis upon which he could have been

subjected to coercion or blackmail. Count 3 alleges that Cisneros lied to FBI Special Agent Bloch on December 30, 1992 that the SF–86 form and the supplement were accurate. Count 4 alleges that Cisneros lied during the December 30, 1992 interview when he stated that he was unaware of anything that could have been used to coerce or compromise him if he were to be nominated and confirmed as secretary of HUD. Count 7 alleges that during the December 30, 1992 interview that Cisneros concealed the fact that Medlar threatened to disclose publicly that he was making payments to her. Count 10 alleges that Cisneros falsely stated on January 7, 1993 to FBI agents that the payments made to Medlar were not "hush money." Finally, Count 14 alleges that on January 7, 1993, Cisneros stated to FBI special agents Bloch and Cronin that Medlar never tried to coerce him to get the payments. Cisneros claims that all of these counts involve the same alleged fact—namely, that Medlar had threatened to reveal publicly information embarrassing to Cisneros if he did not make payments to her.

■ Counts of an indictment are multiplicitous if they both charge a defendant with the same offense. Multiplicitous charges "improperly prejudice a jury by suggesting that a defendant has committed not one but several crimes." *United States v. Reed,* 639 F.2d 896, 904 (2d Cir.1981). "An indictment is multiplicitous, and thereby defective, if a single offense is alleged in a number of counts, unfairly increasing a defendant's exposure to criminal sanctions." *United States v. Anderson,* 39 F.3d 331, 353–54 (D.C.Cir. 1994) (citation omitted). Defendant argues that the proper remedy is to require the government to elect between the. multiplicitous counts.

The test for determining whether two counts of an indictment are multiplicitous is set forth in *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932): "[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each [count] requires proof of

an additional fact which the other does not." *Id.* 284 U.S. at 304, 52 S.Ct. 180.

In *United States v. Olsowy,* 836 F.2d 439 (9th Cir.1987), the court dismissed multiple counts of 18 U.S.C. § 1001 violations based on the defendant's repetition of the same false statement. "[W]e hold that where identical false statements, in either oral or written form, are made in response to identical questions, the declarant may be convicted only once." *Id.* 836 F.2d at 443. *See also United States v. Trent,* 949 F.2d 998, 1000 (8th Cir.1991) (defendant could not be convicted of multiple 18 U.S.C. § 1001 offenses for the repetition of the same false statement); *United States v. Williams,* 552 F.2d 226, 228–29 (8th Cir.1977) (defendant could not be convicted of two perjury offenses based on a repetition of the same false statement to a grand jury). According to the court in *United States v. Salas–Camacho,* 859 F.2d 788 (9th Cir.1988),

The holding in *Olsowy* provides a two-part test for determining whether multiplicitous counts for false statements are permissible. The first is whether a declarant was asked the same question and gave the same answer. The second element is whether later false statements further impaired the operations of the government. *Id.* 859 F.2d at 791.

In this case, unlike *Olsowy,* Cisneros challenges the Indictment before trial. The *Olsowy* test involves factual issues that need development in the record. Thus, pre-trial election would be premature. This Court has held that multiplicity claims can be sorted out post-trial rather than by election:

The Court cannot declare unequivocally that in every case where the Defendant alleges that there exist multiplicitous charges, the appropriate way to proceed is through pre-trial election. This decision is within the discretion of the court, *see United States v. Throneburg,* 921 F.2d 654, 656–57 (6th Cir.1990), and as with any discretionary determination, it is difficult, if not impossible, to construct an abstract formula for deciding one way or another. *United States v. Bowyer,* 985 F.Supp. 153, 155 (D.D.C.1997).

The Court can resolve any potential multiplicity issues at or after trial. At this stage of the proceedings, the Court will deny Cisneros' motion.

### 10. Indictments Clause

■ Cisneros moves this Court to dismiss Counts 2–5 and 10–16 on the ground that they fail to satisfy the requirements of the Indictment Clause of the Fifth Amendment and the Notice Clause of the Sixth Amendment. Additionally, Cisneros moves to dismiss Count 18, which he claims is largely predicated upon the allegations in Counts 2–5 and 10–16. Specifically, Cisneros claims that the Indictment is insufficient because it fails to set forth Cisneros' actual alleged false statement in Count 2, therefore failing to specify the exact manner in which his statements were allegedly false.

Count 2 of the Indictment charges Cisneros with making a false statement on the SF–86 supplement form in violation of 18 U.S.C. § 1001. Question 10S of the Supplement to the SF–86 provided, in pertinent part, the following:

Is there anything in your personal life that could be used by someone to coerce or blackmail you? Is there anything in your life that could cause an embarrassment to you or to the President if publicly known? Is so, please provide full details.

The Indictment alleges that, in response to this question, Cisneros "state[d] in substance, that there was no basis upon which he could have been subjected to coercion or blackmail." Indictment, at 51.

Cisneros argues that the Indictment does not reflect his *actual* response on the SF–86 supplement, which he claims was the following:

No reason for coercion or blackmail. Embarrassments [sic]—details of personal relationships which have largely been referred to in public accounts.

Additionally, Cisneros challenges the sufficiency of Counts 3–5 and 10–16, which charge him with violations of 18 U.S.C. § 1001 based on false statements he allegedly made during FBI interviews on December 30, 1992, and January 7, 1993 and Count 18, which charges his with a violation of 18 U.S.C. § 1505.

Cisneros claims that because these Counts are premised upon the alleged false statement that he made on the SF–86 and its supplement, they are defective for the same reason as Count 2.

"Any discussion of the purpose served by a grand jury indictment in the administration of federal criminal law must begin with the Fifth and Sixth Amendments to the Constitution." *Russell v. United States*, 369 U.S. 749 at 760, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962). The Fifth Amendment guarantees that prosecutions for serious crimes may be instituted only by indictment. *United States v. Haldeman*, 559 F.2d 31, 123 (D.C.Cir.1976). The Grand Jury Clause of the Fifth Amendment states that: "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury" U.S. Const. Amend. V. Further, the Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be informed of the nature and cause of the accusation...." U.S. Const. Amend. VI.

■ In implementing these constitutional guarantees, a valid indictment offers two fundamental protections to the accused: (1) it informs the accused of the charges against him so that he may adequately prepare his defense; and (2) it describes the crime with sufficient specificity to protect the accused against future prosecution for the same offense. *Russell*, 369 U.S. at 763–764, 82 S.Ct. 1038; *see also United States v. Conlon*, 628 F.2d 150, 155 (D.C.Cir.1980). This constitutional protection is further implemented by the requirement of Fed.R.Crim.P. 7(c)(1), which provides that the indictment "shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." This rule is satisfied if the indictment, when construed as a whole, informs the accused of the nature of the charges against him so as to bar future charges against him for the same offense. *United States v. Josephson*, 165 F.2d 82, 83 (2d Cir.1947).

■ Under Rule 7(c), imperfections of form that are not prejudicial are disregarded. As the Supreme Court stated in *Smith v.*

*United States,* 360 U.S. 1, 79 S.Ct. 991, 3 L.Ed.2d 1041 (1959) "[courts have], in recent years, upheld many convictions in the face of questions concerning the sufficiency of the charging papers. Convictions are no longer reversed because of minor and technical defects which did not prejudice the accused. . . . This has been a salutary development in the criminal law." *Id.* 360 U.S. at 9, 79 S.Ct. 991. Further, it is well established that common sense and reason prevail over technicalities. *See United States v. Miranda,* 494 F.2d 783, 788, *cert. denied,* 419 U.S. 966, 95 S.Ct. 228, 42 L.Ed.2d 181 (1974). This does not mean, however, that the fundamental functions and requirements of an indictment have been eliminated. As the Supreme Court has noted, "the substantial safeguards to those charged with serious crimes cannot be eradicated under the guise of technical departures from the rules." *Smith,* 360 U.S. at 9, 79 S.Ct. 991.

■■■■ An indictment is an instrument of accusation, not of proof. Ultimately, the "test of the sufficiency of an indictment is not whether it could have been made more definite and certain, but whether it contains the elements of the offense intended to be charged, and sufficiently apprizes the defendant of what he must be prepared to meet." *Hagner v. United States,* 285 U.S. 427, 431, 52 S.Ct. 417, 76 L.Ed. 861 (1932) (quoting *Cochran v. United States,* 157 U.S. 286, 290, 15 S.Ct. 628, 39 L.Ed. 704 (1864)). Although an indictment must apprise a defendant of the essential elements of the offense with which he is charged, neither the Constitution, the Federal Rules of Criminal Procedure, nor any other authority suggests that an indictment must put the defendant on notice as to every detail considered by the grand jury. Further, indictments "must be read to include facts which are necessarily implied by the specific allegations made." *United States v. Silverman,* 430 F.2d 106, 111–12 (2d Cir.1970).

Cisneros, however, points to *Russell v. United States,* 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962), in which the Supreme Court reversed convictions under a statute which made it a crime for any person summoned to testify before a committee of Con-

gress to refuse to answer "any question pertinent to the question under inquiry." 2 U.S.C. § 192. The basis of the reversal was the Indictment's failure to identify the question under inquiry and the fact that the very core of criminality under 2 U.S.C. § 192 is pertinency to the subject under inquiry of the questions which the defendant refused to answer. What the subject actually was, therefore, is central to every prosecution under the statute. Where guilt depends so crucially upon such a specific identification of fact, an indictment must do more than simply repeat the language of the criminal statute. *Russell,* 369 U.S. at 764, 82 S.Ct. 1038.

In this case, by contrast, the Counts read together clearly notify Cisneros of all of the elements essential to constitute the offenses for which he is charged. The overarching theme of the Counts under consideration is that even as Cisneros made this statement on the SF–86, he was not only aware of his vulnerability to coercion and blackmail, but also was actively paying off Medlar in order to ensure her silence regarding the couple's extra-marital affair. Indictment, at 15–22. The substantial terms of the alleged fraudulent statement are set forth as well as the purpose which was sought to be accomplished (i.e. secure a high level executive position). The allegations go far to inform Cisneros of the misrepresentations charged against him so that he can recognize what the Government claims were fraudulent statements and what misrepresentations were involved.

To require the Indictment to contain the detail sought by Cisneros would render the Indictment invalid for failing to plead evidence that is more appropriate for the trial of the case. The law enunciates no such requirement. Cisneros' objections go only to matters of proof. This does not constitute a basis for asserting that the notice provided in the challenged counts is constitutionally defective. The Court finds that the Indictment, when considered in its entirety, sufficiently apprises Cisneros of the charges against him and effectively precludes him from further prosecution for the same offense. Accordingly, Cisneros' motion will be denied. Additionally, Rosales moves the Court to dismiss

Counts 19 and 20 on the same basis—namely, that they fail to specify the precise manner in which Rosales' statements were false. For the same reasons that the Court denies Cisneros' motion, the Court also denies Rosales' motion.

### 11. Compliance With Prosecutorial Policies

Cisneros moves the Court to dismiss Counts 2–18 and a portion of Count 1 because Cisneros claims that the prosecution of these charges does not comply with the prosecutorial policies of the DOJ as mandated by 28 U.S.C. § 594(f). He argues that the DOJ has a specific policy not to prosecute applicants seeking government employment for allegedly making false statements and concealing material facts during pre-employment background investigations. Because of this DOJ policy, Cisneros claims that the Independent Counsel lacks the necessary prosecutorial authority to prosecute the alleged offenses charged in Counts 2–18 and the relevant portion of Count 1.

Cisneros claims that the DOJ has a distinct policy against prosecuting applicants for government employment for allegedly making false statements during the course of a background investigation. He bases his argument on an historic trend establishing that the DOJ only has prosecuted a handful of such cases in which the false statements related to underlying criminal conduct that was specifically required to be disclosed. To support his argument, Cisneros offers the following instances as examples of this policy: Zoe Baird's withdrawn nomination for Attorney General because of her failure to disclose her unlawful employment of illegal immigrants; Judge Douglas H. Ginsburg's withdrawn nomination for a seat on the Supreme Court because of his non-disclosure of past illegal use of marijuana; and John Tower's failed nomination for Secretary of Defense because of his alleged womanizing and excessive drinking. Cisneros claims that the DOJ has an established unwritten policy against prosecuting such cases.

As a result, Cisneros objects to a portion of Count 1, which alleges that Cisneros conspired to violate 18 U.S.C. § 1001 and 18 U.S.C. § 1505; Counts 2–17, which allege violations of § 1001; and Count 18, which alleges a violation of § 1505. Cisneros claims that DOJ policy specifically advocates not prosecuting any of these charges and, for this reason, the Independent Counsel lacks the necessary prosecutorial authority to pursue these matters.

According to the Ethics in Government Act of 1978 and its 1994 Amendments, "An independent counsel shall, *except to the extent that to do so would be inconsistent with the purposes of this chapter*, comply with the written or other established policies of the Department of Justice respecting enforcement of criminal laws." 28 U.S.C. § 594(f)(1) (emphasis added). The provision also states that the Independent Counsel shall "consult" with the DOJ "to determine these policies" unless, again, it would be "inconsistent with the purposes of this chapter." *Id.*

In this case, the Independent Counsel's prosecutorial discretion is directly in step with DOJ policies. The United States Attorney's Manual, published by the DOJ, explicitly states that alleged § 1001 violations should be prosecuted if "they affect either the operation or integrity of the government." *U.S. Department of Justice, United States Attorney's Manual* § 9–42.130. The Manual gives three examples of false statements warranting prosecution: (1) false statements made "[d]irectly to a federal agency, e.g., application form for employment;" (2) false statements made "[t]o a private person or institution which implements federal programs;" and (3) "false statements in business records which may be subject to federal government inspection." *Id.* The first example given in the Manual speaks directly to the case at hand, as Cisneros committed the alleged offenses "directly to a federal agency" and in an "application form for employment." In addition, any false statements made by Cisneros would significantly "affect either the operation or integrity of the government" given his high-level security clearance and position as a member of the President's Cabinet. Thus, the Independent Counsel's prosecution of Cisneros on the relevant portion of Count 1 and Counts 2–18 are not contrary to DOJ policies.

### 12. The Meaning of "Corruptly" Under 18 U.S.C. § 1505 (1998)

Cisneros moves the Court to dismiss Count 18 for failure to state an offense under 18 U.S.C. § 1505. Count 18 alleges that Cisneros corruptly influenced, obstructed, and impeded the DOJ's investigation into his security clearance. Count 18 of the Indictment alleges that Cisneros violated 18 U.S.C. § 1505, which prohibits the obstruction of proceedings before the government Section 1505 applies to a person who "corruptly ... influences, obstructs, or impedes or endeavors to influence, obstructs or impedes the due and proper administration of the law under which any pending proceeding is being had." Cisneros argues that under § 1505, the term "corruptly" means that he must have influenced another person to obstruct justice. *See United States v. Poindexter*, 951 F.2d 369, 377 (D.C.Cir.1991) (holding that the term "corruptly" in § 1505 has a transitive meaning which means the accused must have influenced another person to violate a legal duty); *see also United States v. Kelley*, 36 F.3d 1118 (D.C.Cir.1994) (reaffirming the decision that "corruptly" requires that the defendant must have corrupted someone else). Given this interpretation of "corruptly," Cisneros argues that the Court should dismiss Count 18 because its allegations refer to facts describing Cisneros' actions alone. Furthermore, Cisneros alleges that Counts 2 through 17 which serve as a basis for Count 18 involve alleged statements made solely by Cisneros and information allegedly concealed by him alone. As such, Cisneros moves to dismiss Count 18 on the basis that § 1505 does not apply to him.

As defined by this Circuit, "corruptly" means that the defendant influenced someone else to obstruct justice. Accordingly, § 1505 does not apply in situations where the defendant acts alone. *See United States v. Poindexter*, 951 F.2d 369, 383 (D.C.Cir.1991). *Poindexter* reasoned that "to read 'corruptly' in an intransitive sense as 'wickedly' or 'immorally' would appear to render the other methods of violating the statute superfluous: surely the use of force to influence a congressional inquiry would always be 'wicked' or at least 'immoral'." *Id.* 951 F.2d at 379. While the parties do not dispute the definition of "corruptly," they differ as to whether Count 18 sufficiently alleged that Cisneros influenced others to obstruct justice.

The Court finds that Count 18 properly alleges a violation of § 1505. Count 18 incorporates other parts of the Indictment, which may be considered in determining whether a count properly charges an offense. *See United States v. Smith*, 44 F.3d 1259, 1265 (4th Cir.1995); Fed.R.Crim.P. 7(c)(1) ("Allegations made in one count may be incorporated by reference in another count.") Count 18 incorporates the "Background to All Counts" section of the Indictment as well as the paragraphs contained in Counts 1–17. The incorporated paragraphs do contain allegations that describe how Cisneros influenced others. For example, the Indictment alleges that Cisneros directed Rosales and Arce–Garcia to conceal information about his relationship with and payments to Medlar. Because Count 18 incorporates these other parts of the Indictment, the Court finds that Count 18 sufficiently alleges a violation of § 1505.

### 13. Necessity of Alleging Elements of Predicate Offenses

Cisneros moves the Court to dismiss a portion of Count 1 for failure to allege essential elements of 31 U.S.C. § 5324 (structuring transactions to evade reporting requirements) which forms the predicate to the conspiracy charged in Count 1. Cisneros states that the Fifth and Sixth Amendments to the United States Constitution and Fed. R.Crim.P. 7(c) require that an indictment allege every element of the offense. Rule 7(c) provides that "the indictment ... shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." The relevant section of Count 1 charges Cisneros conspiring to structure financial transactions in violation of 31 U.S.C. § 5324 to avoid the reporting requirements of 31 U.S.C. § 5313(a), which requires a domestic financial institution involved in the payment, receipt, or transfer in an amount exceeding that prescribed by the Secretary of the Treasury to report the transaction to the Treasury Department. Defendant claims that Count 1 is defective

insofar as it does not specifically allege: (1) that Cisneros knew of Crestar Bank's and First National Bank of Lubbock's obligations to report cash transactions in excess of $10,000; and (2) that Cisneros knew that it was illegal to structure financial transactions in order to avoid triggering such reports. While Count 1 does state that Defendant "unlawfully, knowingly, and willfully" conspired to violate 31 U.S.C. § 5324, Defendant claims that no requisite *mens rea* is alleged in Count 1 other than this statement. Defendant argues that no other section of Count 1 alleges that Defendant knew of the reporting requirements and knew it was unlawful to attempt to evade them. Because the Indictment's charge of conspiracy to violate 31 U.S.C. § 5324 is defective, Defendant urges this Court to dismiss the charge.

 In order to be sufficient, an indictment must set out the material elements of the offense charged.[8] *See United States v. McBride,* 498 F.2d 683 (D.C.Cir.1974). The Supreme Court established a two-part test to determine the sufficiency of an indictment:

> [F]irst, whether the indictment "contains the elements of the offense intended to be charged, 'and sufficiently apprises the defendant of what he must be prepared to meet,'" and, "'in the case any other proceedings are taken against him for a similar offense, whether the record shows with accuracy to what extent he may plead a former acquittal or conviction.'" (Citations omitted).

*Russell v. United States,* 369 U.S. 749, 763–64, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962). There are no "magic words" which make an indictment sufficient; rather, the court must determine whether the accused is apprised of the "nature of the charges against him" and "to notify [him] of the extent of his alleged culpability." *Nelson v. United States,* 406 F.2d 1136, 1136 (10th Cir.1969). With regard to the detail with which allegations must be made, several courts have held that a mere recitation of the statute constituting the offense is insufficient. *See United States v.*

*Berlin,* 472 F.2d 1002, 1007 (2nd Cir.1973); *United States v. Hayes,* 775 F.2d 1279, 1282 (4th Cir.1985). The reason is that "the Sixth Amendment guarantees every defendant the right to be informed of the government's accusations against him." *United States v. Scott,* 993 F.2d 1520, 1521 (11th Cir.1993). If indictments that did not specifically allege wrongdoing were permitted, "a defendant could be convicted on the basis of facts not found by, and perhaps not even presented to, the grand jury that indicted him." *Russell v. United States,* 369 U.S. 749, 770, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962). On the other extreme, "it is not the function of the indictment to plead evidence." *United States v. Carroll,* 332 F.Supp. 1299, 1302 (D.D.C.1971). *See also United States v. Calandra,* 414 U.S. 338, 344–45, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974) (holding that the validity of an indictment is not affected by the character of the evidence considered).

 Because the purpose of the indictment is to notify the accused of the charges against him, it must allege specific facts: "it is not sufficient that the indictment shall charge the offense in the same generic terms as in the definition; but it must state the species,—it must descend to particulars." *United States v. Thomas,* 444 F.2d 919, 921 (D.C.Cir.1971), *quoting United States v. Cruikshank,* 92 U.S. 542, 558, 23 L.Ed. 588 (1875). Generally, "when [an] indictment specifically refers to the statute on which the charge was based, the statutory language may be used to determine whether the defendant received adequate notice." *United States v. Stefan,* 784 F.2d 1093, 1101–02 (11th Cir.1986). However, if an indictment is drawn out in the language of the statute, merely "following the generic wording of a statute is not *necessarily* sufficient." *United States v. Nance,* 533 F.2d 699, 701 (D.C.Cir. 1976) (emphasis added). Rather, the question is whether or not the defendant had adequate notice. As stated above, the Federal Rules of Criminal Procedure merely re-

---

8. Significantly, many cases Defendant cites do not mention indictments. For example, *Ratzlaf v. United States,* 510 U.S. 135, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994) dealt with the sufficiency of jury instructions, as did *United States v. Kim,* 65

F.3d 123 (9th Cir.1995). Likewise, in *United States v. Wynn,* 61 F.3d 921 (D.C.Cir.1995), the court addressed the sufficiency of evidence supporting a conviction rather than the sufficiency of an indictment.

quire "a plain, concise and definite written statement of the essential facts constituting the offense charged." Fed.R.Crim.P. 7(b). Thus in *Stefan* notice based on the statute alone was found to be. sufficient because "practical, rather than technical considerations govern the validity of an indictment." *Stefan*, 784 F.2d at 1102. In *United States v. Scott*, 993 F.2d 1520 (11th Cir.1993), the mere recitation of the statute was held insufficient because there was uncertainty as to which subsection of the statute he was being charged under.

 The Indictment charges Defendant with conspiracy under 18 U.S.C. § 371 to commit illegal structuring in violation of 31 U.S.C. § 5324. As the government correctly points out, an indictment for conspiracy to commit an underlying crime is not equivalent to an indictment charging the underlying crime itself. *See United States v. Felix*, 503 U.S. 378, 390, 112 S.Ct. 1377, 118 L.Ed.2d 25 (1992) (holding that "the agreement to do the act is distinct from the act itself."). Indeed, adjudicating the sufficiency of an indictment alleging conspiracy poses special problems. The Supreme Court held that:

> [I]t is well settled that in an indictment for conspiring to commit an offense in which the conspiracy is the gist of the crime it is not necessary to allege with technical precision all the elements essential to the commission of the offense which is the object of the conspiracy ... or to state such object with the detail which would be required in an indictment for committing the substantive offense.

*Wong Tai v. United States*, 273 U.S. 77, 81, 47 S.Ct. 300, 71 L.Ed. 545 (1927) (citations omitted). The question is not whether or not the Indictment alleges the underlying crime adequately but whether the Indictment adequately alleges a conspiracy to commit the underlying crime. In this case, Cisneros received adequate notification of the charges against him. The lengthy Indictment includes not only a recitation of the statute but specific *information, including the times, places and activities which constitute the unlawful activity.* The Indictment includes allegations of payments which appear to have been made in order to flout the reporting

requirements of § 5324. For example, Count 1 alleges that Cisneros paid Medlar $16,000 in cash payments in $8,000 increments on or about December 16, 1992 and December 18, 1992. Included in Count 1 are allegations that Cisneros attempted to conceal his identity as the source of the payments to Medlar and that Cisneros attempted to keep Medlar silent as to the "nature, purpose and extent of his payments to her and to another woman, so that he could be nominated, confirmed, and serve as Secretary of HUD." Moreover, Count 1 of the Indictment alleges that Cisneros directed Arce–Garcia and Rosales to "conceal from the FBI ... information concerning his relationship with and payments to Medlar." The specificity of such information was sufficient to apprise Cisneros of the charges against him. Accordingly, this Court will dismiss Cisneros's Motion.

### 14. Prosecutorial Jurisdiction

 Cisneros moves the Court to dismiss a portion of Count 1 as well as Counts 8 and 9 because of a lack of prosecutorial authority. He argues that the Attorney General specifically did not seek the appointment of an independent counsel with respect to the matters charged in these counts, which relate to criminal tax violations. Cisneros claims that the Independent Counsel, as a result, did not have the authority to seek or obtain indictments from the grand jury regarding these matters.

In her application to the Special Division of the U.S. Court of Appeals for the District of Columbia Circuit for the appointment of an independent counsel, Attorney General Janet Reno stated: "Our investigation developed no evidence that Secretary Cisneros failed to pay any income or gift taxes due in connection with his payments to Medlar.... I conclude that no further investigation of this matter is warranted *as a criminal tax matter*." *In re Henry G. Cisneros*, Application for Appointment of an Independent Counsel, No. PN 94–3, at 4 (D.C.Cir.Sp.Div. March 13, 1995) (emphasis added). The Attorney General only requested that an independent counsel investigate whether Cisneros violated federal criminal laws "by making false state-

ments with respect to his past payments to Linda Medlar to the Federal Bureau of Investigation during the course of his background investigation or conspiring with others to do so." *Id.*

In response to the Attorney General's request, the Independent Counsel indicted Cisneros on 21 counts. Cisneros objects to a portion of Count 1, which addresses an alleged conspiracy to violate 31 U.S.C. § 5324(a)(3), prohibiting the structuring of financial transactions to evade the reporting requirements of 31 U.S.C. § 5313(a), and to Counts 8 and 9, which charge him with concealing from the FBI the alleged "structuring" of payments to Medlar and the alleged failure to file informational gift tax returns to the Internal Revenue Service. Cisneros claims that each of these counts are "criminal tax matters" which the Attorney General specifically requested should not be pursued.

Under 28 U.S.C. § 593(b)(3), "the independent counsel has adequate authority to fully investigate and prosecute the subject matter with respect to which the Attorney General has requested the appointment of the independent counsel, and all matters related to that subject matter." In *Morrison v. Olson,* 487 U.S. 654, 656, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988), the Supreme Court interpreted this statute to mean the independent counsel's prosecutorial jurisdiction "must be demonstrably related to the factual circumstances that gave rise to the Attorney General's request for the appointment of independent counsel in the particular case." Decisions in the D.C. District Court have further clarified this issue: "To demonstrate that one occurrence is 'related' to another, one need only show that there is a reasonable causal or logical connection between the two, some tenable correlation between events." *United States v. Secord,* 725 F.Supp. 563, 566 (1989) (Robinson, C.J.); *see also United States v. Blackley,* 986 F.Supp. 607, 611 (1997) (Lamberth, J.).

Although Counts 8 and 9 and a portion of Count 1 relate to alleged criminal tax violations, they are still under the prosecutorial jurisdiction of the Independent Counsel. The Attorney General's request for the appointment of an independent counsel

centered on an investigation into false statements made by Cisneros to the FBI regarding his relationship with Medlar. Although she admitted in her application that "minor" criminal tax violations may be present, Attorney General Reno decided to focus on false statements made by Cisneros. While Counts 8 and 9 and a portion of Count 1 all contain allegations of criminal tax violations, the allegations are not being prosecuted as criminal tax matters. Counts 8 and 9 are fraudulent representation charges and the portion of Count 1 in dispute is a conspiracy charge. The allegations of criminal tax violations serve as underlying conduct relating to the alleged false statements Cisneros made to the FBI and to the alleged conspiracy involving the defendants. Cisneros' false statements and involvement in a conspiracy are being prosecuted, not the underlying tax violations. Accordingly, the Court will deny Cisneros' motion.

### 15. The Conspiracy as Alleged in Count 1

Cisneros and Arce–Garcia move the Court to dismiss Count 1 of the Indictment because it improperly alleges multiple conspiracies. Cisneros claims that Count 1 alleges at least three conspiracies: (1) a conspiracy whereby Cisneros paid Medlar to "ensure her public silence" regarding the scope and nature of their relationship; (2) a conspiracy between Cisneros, Rosales, and Arce–Garcia to obstruct an FBI background investigation into the first conspiracy and the financial condition of Cisneros Communications; and (3) a conspiracy between Cisneros and Medlar to structure payments to avoid federal reporting requirements.

"An indictment may not charge multiple conspiracies in a single count." *United States v. Cryan,* 490 F.Supp. 1234, 1239 (D.N.J.1980); *United States v. Rosenblatt,* 554 F.2d 36, 39 (2d Cir.1977). "Whether the object of a single agreement is to commit one or many crimes, it is in either case that agreement which constitutes the conspiracy which the statute punishes. The one agreement cannot be taken to be several agreements and hence several conspiracies because it envisages the violation of several

statutes rather than one." *Braverman v. United States*, 317 U.S. 49, 53, 63 S.Ct. 99, 87 L.Ed. 23 (1942). "A single conspiracy is proven if the evidence establishes that each conspirator had the specific intent to further the common unlawful objective." *United States v. Tarantino*, 846 F.2d 1384, 1392 (D.C.Cir.1988).

According to the law of this Circuit, "In order to prove than an agreement existed, the government need only show that the conspirators agreed on 'the essential nature of the plan,' not that they 'agreed on the details of their criminal scheme.'" *United States v. Gatling*, 96 F.3d 1511, 1518 (D.C.Cir.1996) (citations omitted). The *Gatling* court set forth the following factors for determining whether an indictment charges a single conspiracy or multiple conspiracy:

> In determining whether the evidence supports a finding of a single conspiracy or instead only demonstrates multiple conspiracies, we look at whether the defendants 'shared a common goal,' any 'interdependence between the alleged participants,' and 'any overlap among alleged participants,' such as the presence of core participants linked to all the defendants. *Id.* 96 F.3d at 1520.

■ There is no reason to conclude that, as a matter of law, a single conspiracy cannot be formed among several persons to conceal certain information from a number of investigating entities. The Court finds that it is premature to make a determination about the conspiracy before the Government has had a chance to introduce its evidence at trial. The analysis of this Circuit's factors in *Gatling* depends upon a developed record. "The existence of a single conspiracy or multiple conspiracies is primarily a question of fact for the jury." *United States v. Tarantino*, 846 F.2d 1384, 1391 (D.C.Cir.1988); *see also United States v. Johansen*, 56 F.3d 347, 350 (2d Cir.1995). Even if the Government does prove multiple conspiracies at a trial, the Defendants cannot escape liability unless they make "a showing of substantial prejudice, i.e., that the evidence proving the conspiracies in which the defendant did not participate prejudiced the case against him in the conspiracy to which he was a party."

*Johansen*, 56 F.3d at 351. This determination cannot be made until the Government has presented its evidence at trial. Since Cisneros' and Arce–Garcia's motions are premature at this stage of the proceedings, the Court will deny their motions.

### 16. Inconsistent Allegations

■ Cisneros moves the Court to dismiss Count 10 and a portion of Count 1 because each count allegedly contains internally inconsistent allegations. Cisneros claims that counts 1 and 10 of the Indictment are fatally flawed because each contains internally inconsistent allegations. Cisneros argues that the allegation in Count 10 that he paid "hush money" to Medlar is inconsistent with other allegations in the Indictment suggesting that the payments to Medlar were not "hush money." The Indictment alleges that: (1) the extramarital affair between Cisneros and Medlar was public knowledge as early as October of 1988; (2) that Cisneros made payments to Medlar as early as 1989, in approximately the same amounts as the later payments; and (3) that the earliest date mentioned in the Indictment that Cisneros was being considered for an appointment was November 22, 1992. Cisneros argues that these three allegations, taken together, suggest that the payments to Medlar could not have been "hush money." He claims that before November 1992, when he was being considered for an appointment, there was no reason to hush the relationship because it was public knowledge. Cisneros asserts that the Indictment fails to state that the purpose of the payments changed to "hush money" after November 1992; instead, the Indictment alleges that Cisneros "continued" to pay Medlar, implying that all of the payments were for the same purpose. In addition, Cisneros makes the same argument about Count 1, which alleges that Cisneros and Medlar conspired to "ensure her public silence" regarding their relationship.

■ A count of an indictment is "repugnant" and must be dismissed if there is a "contradiction between material allegations" in the count. *See United States v. Briggs*, 54 F.Supp. 731, 732 (D.D.C.1944); *Cohen v. Wilhelm*, 63 F.2d 543, 545 (3d Cir.1933).

The Indictment alleges that the purpose of the payments was not merely to silence Medlar about the relationship but also to conceal Cisneros' previous payments to Medlar. The word "continued" in the Indictment does not logically imply that the payments were always for the same purpose. Cisneros has failed to establish that the Indictment contains inherently inconsistent allegations. The determination of the purpose of the payments is an issue of fact for the jury to determine. Because the Court cannot find an inherent inconsistency, it will deny Cisneros' motion.

### 17. Conspiratorial Objective

■ Cisneros moves the Court to dismiss Count 1, charging a conspiracy between Medlar and Cisneros, because as a matter of law, a conspiracy could not have existed between them. Cisneros claims that because Count 1 alleges that Medlar extorted money from Cisneros, they both cannot have agreed to carry out a common objective, and thus cannot have conspired as alleged in the Indictment.

A conspiracy requires: (1) an agreement between two or more persons; and (2) an intent to achieve a common unlawful objective. *See United States v. Gaviria*, 116 F.3d 1498, 1515 (D.C.Cir.1997), *cert. denied*, 118 S.Ct. 865, 139 L.Ed.2d 763 (1998). Conspirators must have a "shared common goal" or a "shared common purpose." *United States v. Childress*, 58 F.3d 693, 707 (D.C.Cir.1995). "[S]pecificity with respect to the 'object' of the conspiracy is essential." *Rosenblatt*, 554 F.2d 36, 39 (2d Cir.1977).

■ The requirement that a conspiracy have a common objective does not imply that each conspirator have the same motive. Just because two co-conspirators are in an extortionate relationship does not logically imply that they do not have a shared objective. If the extortioner lets the cat out of the bag, then his or her ability to extort would be over. It is in the interest of both the extortioner and the extortionee to conceal the potentially pernicious information. In this case, the alleged shared common goal was the concealment of the relationship and payments. This Court does not find, as a matter of law, that it is impossible for two individuals in an extortionate relationship to have a shared common goal for the purposes of forming a conspiracy.

### 18. Wharton's Rule

■ Cisneros moves the Court to dismiss a portion of Count 1, charging all four Defendants with conspiracy to violate 18 U.S.C. § 1505 because it violates Wharton's Rule. Cisneros argues that under Wharton's Rule, "an agreement by two persons to commit a particular crime cannot be prosecuted as a conspiracy when the crime is of such a nature as to necessarily require the participation of two persons for its commission." *United States v. Rueter*, 536 F.2d 296, 298 (9th Cir.1976). Because obstruction of justice under § 1505 requires at least two people, Cisneros reasons that the charge of conspiracy to obstruct justice is invalid and should be dismissed.

The Court finds that Counsel's charge of conspiracy to obstruct justice does not violate Wharton's Rule. Wharton's Rule was originally identified in a treatise on criminal law by Francis Wharton. As defined by Wharton's treatise, Wharton's rule provides that: "An agreement by two persons to commit a particular crime cannot be prosecuted as a conspiracy when the crime is of such a nature as to necessarily require the participation of two persons for its commission." 1 R. Anderson, Wharton's Criminal Law and Procedure § 89, at 191 (1957); *see also Iannelli*, 420 U.S. at 773 n. 5, 95 S.Ct. 1284, 43 L.Ed.2d 616. "The Rule has been applied by numerous courts, state and federal alike. It also has been recognized by [the Supreme Court]." *Iannelli*, 420 U.S. at 774, 95 S.Ct. 1284.

In this case, Wharton's Rule is inapplicable because the case falls under the "third-party" exception rule. The third-party exception applies when "the conspiracy involves the cooperation of a greater number of persons than is required for commission of the substantive offense." *Iannelli* 420 U.S. at 775, 95 S.Ct. 1284 (citing *Gebardi v. United States*, 287 U.S. 112, 53 S.Ct. 35, 77 L.Ed. 206 (1932)). As the Supreme Court explained:

[W]hile the two persons who commit adultery cannot normally be prosecuted both for that offense and for conspiracy to commit it, the third-party exception would permit the conspiracy charge where a 'matchmaker'-the third-party-had conspired with the principals to encourage commission of the substantive offense.

*Iannelli v. United States,* 420 U.S. 770, 784 n. 15, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975).

In *United States v. Becker,* 461 F.2d 230 (2d Cir.1972), the Court of Appeals held that the conspiracy charge against defendants who violated a gambling statute was valid because the number of people named in the indictment (seven) was more than the statutory requirement for such a violation (five). *See Becker,* 461 F.2d at 233. As the Court explained:

As long as the conspiratorial concert of action and the substantive offense underlying it are not coterminous and fewer participants are required for the commission of the substantive offense than are named as joining in a conspiracy to commit it, there is no infirmity in the conspiracy indictment.

*Id.* at 243 (citing *United States v. Benter,* 457 F.2d 1174, 1178 (2d Cir.1972)).

In this case, the "third party" exception to Wharton's Rule clearly applies. Count 1 charges all four Defendants with conspiracy. However, the substantive violation, obstruction of justice, requires only the participation of two people. *See supra* Section 12. While an obstruction of justice violation requires the participation of at least two individuals, the conspiracy, as it is charged in Count 1, involves four individuals (Cisneros, Medlar, Arce–Garcia, and Rosales). Because there is a greater number of people who allegedly conspired than are necessary to obstruct justice, the Court finds that the "third party" exception to Wharton's Rule applies. Ac-

cordingly, the Court will deny Cisneros' motion.[9]

## 19. Prejudicial Surplusage

 Cisneros moves the Court to strike allegedly non-essential and prejudicial statements in the Indictment. Cisneros claims that the Indictment goes beyond what is necessary to describe the factual allegations of conduct on which the charges are based. Specifically, Cisneros contends that the Indictment contains the following surplusage: (1) discussion of the "public trust" of the Secretary of HUD and the mission of HUD; (2) selective quotations from documents regarding the purported purpose and authority of the background investigations; (3) references to the duties of the FBI and IRS; (4) reference to previous background investigation; (5) repeated use of the phrases "among other things" and "among others"; (6) discussion of the Inside Edition episode; (7) discussion of subsequent investigation of Cisneros; and (8) discussion of the FBI directive regarding additional questions for the interview of Cisneros.

 Fed.R.Crim.P. 7(d) provides that "[t]he court on motion of the defendant may strike surplusage from the indictment or information." Courts have "wide discretion" to strike surplusage from an Indictment. *United States v. Poindexter,* 725 F.Supp. 13, 35 (D.D.C.1989). "Motions to strike surplusage from an indictment are highly disfavored in this Circuit." *United States v. Watt,* 911 F.Supp. 538, 554 (1995); *United States v. Jordan,* 626 F.2d 928, 930 n. 1 (D.C.Cir.1980) ("The standard under Rule 7(d) has been strictly construed against striking surplusage."). "[I]f evidence of the allegation is admissible and relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken." *United States v. Scarpa,* 913 F.2d 993, 1013 (2d Cir.1990).

---

9. Cisneros bases his argument on his assertion, discussed *supra* in Section 15 of this Memorandum Opinion, that the conspiracy alleged in Count 1 actually consists of three separate conspiracies. This Court has determined that it is premature at this stage of the proceedings to determine the nature of the conspiracy. If there are three separate conspiracies as Cisneros claims, then the Court would have to revisit its analysis of whether any of these three conspiracies violates Wharton's rule. However, at this time, based on the manner in which the conspiracy is currently alleged in the Indictment, the Court finds that the conspiracy does not run afoul of Wharton's rule.

The "surplusage" that Cisneros wants the Court to strike concerns either essential elements of the charges against Cisneros or provides useful and important background information. The Government is not required to provide a bare-bones Indictment; in fact, the opposite is encouraged. "[T]he background section of an indictment is essential because it provides the defendant and the jury with the factual bases surrounding the charges against the defendant." *Watt*, 911 F.Supp. at 553. Further, the Court finds that Cisneros has failed to establish how these sections of the Indictment would cause him significant prejudice at trial. What is more, there is no requirement that the Indictment in any specific form be submitted to the jury. Indeed, unless a defendant so requests, the Court knows of no requirement that an indictment in its entirety must be placed into evidence or otherwise submitted to the jury.

### 20. Post–Conspiracy Allegations

Cisneros moves the Court to strike the allegations of Count 1 of the Indictment which allegedly post-date the termination of the conspiracy charged in Count 1. Cisneros claims that the alleged conspiracy terminated on January 21, 1993, when Cisneros was formally nominated and confirmed as Secretary of HUD. Cisneros argues that at the very latest, the alleged conspiracy terminated in January 1994, when Cisneros' alleged payments to Medlar ceased or on July 29, 1994, when the information the alleged conspiracy sought to conceal became a matter of public knowledge.

A conspiracy terminates "after the central criminal purposes" of the conspiracy "have been attained," *Grunewald v. United States*, 353 U.S. 391, 401–02, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957), or when the "ends [of the conspiracy have] been so frustrated or its means so impaired that its continuation was no longer plausible." *United States v. Gibbs*, 739 F.2d 838, 845 n. 18 (3d Cir.1984). These standards involve factual determinations that must be made by a jury. Because the date of the termination of the conspiracy is an issue for the jury to determine, the Court

will deny Cisneros' motion at this stage of the proceedings.

### 21. Bill of Particulars

Cisneros moves the Court for a bill of particulars, requesting that the Government provide him with more specific details of the charges against him. He claims that the Indictment is insufficient to permit him to prepare an adequate defense. Accordingly, he requests, *inter alia*, that the Government specifically identify the allegedly false statements which form the basis of the Indictment, the questions to which the alleged false statements and concealments were allegedly responsive, and the manner in which the statements are alleged to be false. For the reasons stated below, this Court will deny the motion.

As a general rule, if an indictment does not sufficiently allege the nature and extent of the crime to allow the accused to prepare his defense, the accused may move for a bill of particulars, which requires the government to specify the acts which it intends to rely upon at trial. In other words, the function of a bill of particulars is to provide the defendant with enough information of the charges against him to prepare his defense and to avoid prejudicial surprise at trial. *See United States v. Espy*, 989 F.Supp. 17, 34 (D.D.C.1997); *United States v. NYNEX Corp.*, 781 F.Supp. 19, 22 (D.D.C. 1991); *United States v. Madeoy*, 652 F.Supp. 371, 374 (D.D.C.1987) *aff'd* 912 F.2d 1486 (D.C.Cir.1990). However, a bill of particulars is not meant to be a tool for the defense to obtain pre-trial disclosure of all the evidence held by the Government. *United States v. Kilrain*, 566 F.2d 979, 985 (5th Cir.1978). The Government does not have a duty to furnish all the facts that the defendant wants.

The decision to require a bill of particulars rests within the sound discretion of the trial court. *See, e.g.*, Fed.R.Crim.P. 7(f); *United States v. Butler*, 822 F.2d 1191, 1193– 94 (D.C.Cir.1987). Where a defendant has enough information to understand the charges alleged in the indictment against him and to conduct his own investigation of those charges, the government should not be re-

quired to prepare a bill of particulars. *See Butler,* 822 F.2d at 1193 ("If the indictment is sufficiently specific, or if the requested information is available in some other form, then a bill of particulars is not required.").

■ In this case, Cisneros seeks a bill identifying: (a) the allegedly false statements which form the basis of the indictment; (b) the questions to which the alleged false statements and concealment were allegedly responsive; (c) the precise manner in which the statements are alleged to be false; (d) the alleged duty to disclose the information which was allegedly concealed; (e) the alleged affirmative acts of concealment; (f) the alleged acts of obstruction; (g) the individuals whom Cisneros allegedly corrupted; (h) the dates of the alleged acts of obstruction; (i) the dates on which the alleged Personnel Office proceeding and Senate inquiry were pending; (j) the persons with whom Cisneros allegedly conspired; and (k) the precise manner in which Cisneros purportedly carried out the alleged conspiracy.

This Court finds that the 65–page Indictment sufficiently informs Cisneros of the charges against him to allow for the preparation of his defense. The Indictment contains 31 pages of background facts, including details about the duration of the defendant's alleged criminal conduct; the unlawful nature of the defendant's conduct; the names of the individuals involved in the alleged conspiracies; and the specific dates when the defendant purportedly engaged in the alleged crimes. Read as a whole, the Indictment clearly provides enough information to allow Cisneros to understand the charges against him and prepare to defend himself against those charges. The detail that Cisneros requests the Government to provide is beyond the proper scope of a bill of particulars. Accordingly, the Court will deny Cisneros' motion.

## III. CONCLUSION

There comes a point in the trial of a case when pre-trial proceedings must wind down and the parties proceed to the main event. That time has now come. Except for the pending motions relating to the so-called Medlar tapes issues, the case will proceed to trial.

An appropriate order accompanies this Memorandum Opinion.

## *ORDER*

This matter comes before the Court on the pretrial motions made by Defendants Cisneros, Arce–Garcia, and Rosales. For the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that Defendant Henry G. Cisneros' motion to dismiss Counts 1–18 because of separation of powers and the political question doctrine is **DENIED;** it is further

**ORDERED** that Cisneros' motion to dismiss Counts 2–17 and a portion of Count 1 for failure to state an offense because Cisneros' statements did not concern a matter within the jurisdiction of a federal department or agency is **DENIED;** it is further

**ORDERED** that Cisneros' motion to dismiss Count 18 and a portion of Count 1 for failure to state an offense under 18 U.S.C. § 1505 because there was not a pending proceeding is **DENIED;** it is further

**ORDERED** that Cisneros' motion to dismiss Count 18 and a portion of Count 1 on the grounds that the alleged proceeding and inquiry were allegedly not due and proper is **DENIED;** it is further

**ORDERED** that Cisneros' motion to dismiss Counts 2–18 on the ground that the false statements and acts of concealment alleged in those counts are immaterial is **DENIED;** it is further

**ORDERED** that Defendant Rosales' motion to dismiss Counts 19 and 20 because the false statements and acts of concealment alleged in those counts are immaterial is **DENIED;** it is further

**ORDERED** that Cisneros' motion to dismiss Counts 6–9 and 17–18 for failing to state an offense under 18 U.S.C. § 1001 because Cisneros was under no legal duty to disclose information concerning his relationship with Medlar is **DENIED;** it is further

**ORDERED** that Cisneros' motion to dismiss Counts 2–5, 10–11, 15–16, and 18 be-

cause the alleged false statements at issue are vague is **DENIED**; it is further

**ORDERED** that Cisneros' motion to dismiss Counts 3–5, 10–16, and 18 because there are no verbatim transcripts of the FBI interviews is **DENIED**; it is further

**ORDERED** that Cisneros' motion to compel election among allegedly multiplicitous counts is **DENIED**, it is further

**ORDERED** that Cisneros' motion to dismiss Counts 2–5, 10–16, and 18 because they allegedly fail to satisfy the requirements of the Indictment Clause is **DENIED**; it is further

**ORDERED** that Defendant John Rosales' motion to dismiss Counts 19 and 20 for failing to specify how Rosales' statements were false is **DENIED**; it is further

**ORDERED** that Cisneros' motion to dismiss Counts 2–18 and a portion of Count 1 because the Independent Counsel allegedly failed to comply with the prosecutorial policies of the Department of Justice is **DENIED**; it is further

**ORDERED** that Cisneros' motion to dismiss Count 18 for failure to state an offense under 18 U.S.C. § 1505 is **DENIED**; it is further

**ORDERED** that Cisneros' motion to dismiss a portion of Count 1 for failure to allege essential elements of the currency structuring offense that forms the predicate to the conspiracy charged in Count 1 is **DENIED**; it is further

**ORDERED** that Cisneros' motion to dismiss Counts 8–9 for lack of prosecutorial jurisdiction is **DENIED**; it is further

**ORDERED** that Cisneros' motion to dismiss Count 1 because it alleges multiple conspiracies is **DENIED**; it is further

**ORDERED** that Defendant Sylvia Arce-Garcia's motion to dismiss Count 1 for multiplicity is **DENIED**; it is further

**ORDERED** that Cisneros' motion to dismiss Count 10 and a portion of Count 1 because each count allegedly contains inter-

nally inconsistent allegations is **DENIED**; it is further

**ORDERED** that Cisneros' motion to dismiss Count 1 for failure to state an offense is **DENIED**; it is further

**ORDERED** that Cisneros' motion to dismiss a portion of Count 1 based on Wharton's rule is **DENIED**; it is further

**ORDERED** that Cisneros' motion to strike prejudicial surplusage from the Indictment is **DENIED**; it is further

**ORDERED** that Cisneros' motion to strike all allegations in the Indictment that post-date the termination of the alleged conspiracy is **DENIED**; it is further

**ORDERED** that Cisneros and Arce–Garcia's motions for a bill of particulars is **DENIED**.

## MEMORANDUM OPINION AND ORDER DENYING RECONSIDERATION

This matter comes before the Court on Defendant Cisneros' motion for reconsideration of this Court's rulings with respect to Pretrial Motions Nos. 4, 5, 7, 13, 15, 16 and 25.[1] On July 30, 1998 this Court issued a Memorandum Opinion denying all 21 of Cisneros' motions concerning counts 1–20 of the indictment, including the seven listed above. See Memorandum Opinion and Order of July 30, 1998. Counts 19 and 20 relate only to Defendant Rosales. Count 21 relates only to Defendant Medlar who has since been severed from the case. See Memorandum Opinion of June 19, 1998. The remaining Counts 1–18 charge Cisneros with conspiracy to withhold information from and make false statements to, various government entities in order to ensure his successful nomination as Secretary of the United States Department of Housing and Urban Development. On August 10, 1998 Cisneros filed a notice of appeal from those parts of the Opinion denying his motion to dismiss on separation of powers and political question grounds. In his notice of appeal, Cisneros expressed his intention to file a motion for reconsideration with this Court and requested that the Court

---

1. Defendant Arce–Garcia joins in the motion for reconsideration. Although the Court will refer to Defendant Cisneros only, it has considered both Defendants' motions fully.

of Appeals stay any appeal proceedings pending this Court's decision on the motion for reconsideration. On August 12, 1998, two days after filing his notice to appeal, Cisneros filed his motion for reconsideration.

## A. Jurisdiction

 The Supreme Court has provided the courts with clear direction as to how to proceed when a defendant simultaneously files a notice of appeal with the appellate court and a motion for reconsideration with the district court. The filing of the notice to appeal strips the district court of jurisdiction to hear "those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58, 103 S.Ct. 400, 74 L.Ed.2d 225 (1982). The Court of Appeals for the District of Columbia strictly enforces this standard. *United States, v. DeFries*, 129 F.3d 1293 (D.C.Cir.1997). In *DeFries*, the district court dismissed a mail fraud count against the defendant and the government appealed. The Court of Appeals reinstated the count but withheld issuance of the mandate in order to allow a period for a timely petition for rehearing. The District Court, despite the absence of the mandate, proceeded to trial and the defendant was convicted on the mail fraud count. The Court of Appeals, relying on the standard set forth in *Griggs*, reversed the conviction and held that the District Court lacked jurisdiction to proceed absent the mandate. *DeFries*, 129 F.3d at 1302.

Contrary to the position taken by the Court of Appeals in *DeFries*, Cisneros claims that this Court has jurisdiction to hear his motion. In support of his contention, Cisneros urges the Court to adopt the procedure laid out by the Court of Appeals for the District of Columbia in *Smith v. Pollin*, 194 F.2d 349 (D.C.Cir.1952). In *Smith*, the Court of Appeals held that a District Court is free to consider a motion for a new trial after the filing of a notice of appeal in order to determine whether newly-discovered evidence warranted granting the motion. The Court concluded that the District Court may order the parties to file a motion for a remand with the appellate court in the event that the District Court grants the motion. *Smith*, 194 F.2d at 350.

This Court does not believe that *Smith* controls this case. The considerations involved in granting a motion for a new trial based on newly-discovered evidence differ in significant respects from those involved in considering a motion for reconsideration of a pre-trial motion. The Court of Appeals for this circuit has not indicated a willingness to expand *Smith* beyond cases involving motions for new trials based on newly-discovered evidence. Accordingly, and in light of the clear direction provided by this Circuit's decision in *DeFries*, this Court lacks jurisdiction to consider Cisneros' motion.[2]

## B. Motion for reconsideration

 While the Court lacks jurisdiction to proceed further with the case at this time, it believes it would be helpful to state its views in order to expedite this matter and to provide the parties with appropriate guidance in the event Defendant's appeal fails. This Court would deny Cisneros' motion for reconsideration on the following three grounds. First, Cisneros claims that this Court did not address all of the legal grounds set forth in his motion to dismiss. Contrary to Cisneros' suggestion, District Courts are not required to respond in writing to every issue raised in a party's motion. Rather, courts have the duty to consider fully the validity of a pending motion and to render an appropriate decision. This Court, having fully considered all of Cisneros' pre-trial motions prior to issuing its July 30 Memorandum Opinion, satisfied its judicial duty.

Second, a number of Cisneros' pre-trial motions raise mixed questions of fact and law. Generally, such questions can be re-

2. This Court does not believe that the denial of Cisneros' motion will result in any unfairness to the Defendant. Cisneros claims to have been concerned that his right to an appeal would be lost had he waited to file his notice of appeal until after the filing of his motion. However, this concern while clearly understandable could have been alleviated in another way. The filing of a motion for reconsideration tolls the running of the period in which to file a notice of appeal. *United States v. Healy*, 376 U.S. 75, 79, 84 S.Ct. 553, 11 L.Ed.2d 527 (1964). Had Cisneros wished to have this Court consider his motion for reconsideration, while simultaneously preserving his right to appeal, he simply needed to reverse the order of his filings.

solved only after a factual presentation made during a trial. Defendant's suggestion that this Court consider his motion at this point would require this Court to in effect hold two trials: one, before the Court on the issues presented in Cisneros' motions and another before a jury with respect to those factual issues not determined in Defendant's favor. This "heads I win, tails you lose approach" is clearly inconsistent with judicial efficiency and economy. It is an unwise use of scarce judicial resources to conduct two trials when one would suffice.

■ Third, the Court reiterates its position with respect to the appropriate application of the separation of powers and political question doctrines to this case. The Founding Fathers did not intend for either of these doctrines to act as an impediment to the political process. Rather, those who conceived our precious and unique tripartite form of government envisioned a system whereby the three branches of government would work together in unison. Too often, however, these dual concepts are asserted to impede the effective functioning of government. Often lost in this invocation is the equally important doctrine of "complementary powers of government". This term describes a system of government composed of co-equal branches functioning together as complementary, not opposing, forces. Complementary powers, in conjunction with the separation of powers, ensures the smooth operation of government. Therefore, the proper inquiry in applying the separation of powers and complementary powers doctrines is to determine whether they, working together, advance the interests of the citizenry without doing violence to one another.

Cisneros' sole reliance on the doctrine of separation of powers frustrates this test and could adversely affect the proper functioning of government. Defendant's position would allow unqualified candidates for high public office to lie their way into extremely sensitive and important positions of government. It would be unacceptable to place the citizens of this Nation at such a risk.

There is nothing to indicate that the other branches of government view either the doctrine of separation of powers or that of political question to be a barrier to this Court's exercise of jurisdiction. These issues of political question and justiciability were before the Attorney General, if not explicitly then implicitly, when she considered the appointment of an Independent Counsel to investigate Cisneros. There would have been no legal basis for the appointment of an Independent Counsel had the Attorney General believed either doctrine to be applicable. What is more, the Court of Appeal's Special Division for the Appointment of an Independent Counsel should have refrained from exercising its jurisdiction in making the appointment if Cisneros' position is correct. Moreover, the President, through the exercise of his pardon power has the authority to bring an immediate end to this process if he believes the Judiciary to be treading on the Executive's prerogative. Similarly, the legislative branch, by establishing a different vetting protocol or enacting appropriate legislation to preclude the Judiciary from adjudicating this case, could have protected its interests if it believed they were being transgressed. Indeed, it is understood that these vetting procedures routinely have been used during past changes in administration.

Therefore, in light of the above, if and when this Court's jurisdiction is reinstated, the Court will deny Cisneros' motion for reconsideration. Until such time, however, this Court is without power to act.

### C. Trial Continuance

On January 8, 1998 this case was set for trial on November 4, 1998. The parties were told that the Court was giving them a date some eleven months from the time of indictment to accommodate all pre-trial activities and to make it clear that November 4 would be a date certain. Despite its intentions, the parties have now advised the Court that because of Defendant's appeal, it is unlikely that the November 4 trial date can be met. While this Court truly hopes that the Court of Appeals will consider Defendant's motion on an expedited basis and render a prompt decision, this Court believes it has no alternative but to adjourn the November 4, 1998 trial date. The parties are urged to fulfill their representations made to this Court to seek a prompt review of Defendant's appeal.

The parties are advised that the trial will be rescheduled on short notice in the event Defendant's appeal fails. Both sides are once again urged to expedite the appellate process so that, hopefully, a trial date sometime this year can be scheduled. As a first step, it is requested that the parties communicate this Court's position to the Court of Appeals.

Accordingly, it is hereby **ORDERED** that the November 4, 1998 trial date is vacated.